# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

## APPEAL NO. 23-1087

---

## TONYA C. HUBER,
## PLAINTIFF-APPELLANT,

### v.

## WESTAR FOODS, INC.,
## DEFENDANT-APPELLEE.

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

---

## Brief of Plaintiff-Appellant Tonya C. Huber

---

Alexis S. Mullaney, #25908
Fiedler Law Firm, PLC
17330 Wright Street, Suite 102
Omaha, NE 68130
(402) 316-3060
(402) 513-6501 (facsimile)
alexis@employmentlawnebraska.com

Attorney for Plaintiff-Appellant

# I.     SUMMARY OF THE CASE

Plaintiff-Appellant Tonya C. Huber ("Tonya") brought this case against Defendant-Appellee Westar Foods, Inc. ("Westar") alleging claims of disability discrimination, interference under the Family Medical Leave Act ("FMLA"), and retaliation for engaging in protected activity under the FMLA.

Tonya appeals the District Court's Order entering Summary Judgment for Westar on her FMLA interference and disability discrimination claims. Specifically, the District Court improperly relied on Westar's "good-faith belief" in dismissing Tonya's FMLA interference claim, despite well-established Eighth Circuit precedent holding an employer's intent is immaterial to its FMLA interference liability. Additionally, in dismissing Tonya's disability discrimination and FMLA retaliation claims, the District Court failed to consider conduct evidencing discriminatory animus by Tonya's supervisor, upon whose knowledge and judgment Westar's alleged ultimate decisionmaker relied.

Tonya requests this Court reverse the District Court's order granting Westar's Motion for Summary Judgment and remand the case for trial. Tonya further requests this Court reinstate Tonya's Motion for Partial Summary Judgment and Tonya's Motion to Strike so both motions may be substantively ruled on by the District Court. Tonya respectfully requests 20 minutes of oral argument per side, to address the significant legal issues raised in this appeal.

i

# II.    TABLE OF CONTENTS

I.    SUMMARY OF THE CASE ................................................................... i

II.    TABLE OF CONTENTS ..................................................................... ii

III.    TABLE OF AUTHORITIES ................................................................ iv

IV.    JURISDICTIONAL STATEMENT ....................................................... 1

V.    STATEMENT OF ISSUES – APPOSITE CASES .................................. 2

VI.    STATEMENT OF THE CASE .............................................................. 4

   A.    Substantive Facts ...................................................................... 4

   B.    Procedural Background .............................................................. 18

VII.    SUMMARY OF THE ARGUMENT .................................................... 19

VIII.    ARGUMENT .................................................................................. 21

   A.    Standard of Review for District Court's Dismissal of Tonya's FMLA

   Interference, FMLA Retaliation, and ADA Discrimination Claims ...................... 21

   B.    The District Court Improperly Granted Westar's Motion for Summary

   Judgment on Tonya's FMLA Interference Claim ..................................... 22

   C.    The District Court Improperly Granted Westar's Motion for Summary

   Judgment on Tonya's FMLA Retaliation Claim ..................................... 33

Appellate Case: 23-1087    Page: 3    Date Filed: 03/06/2023 Entry ID: 5251865

D.   The District Court Improperly Granted Westar's Motion for Summary

Judgment on Tonya's Disability Discrimination Claim ............................................. 38

E.   The District Court's Denial of Plaintiff's Motions Should be Reversed ..... 47

IX.   CONCLUSION ................................................................................................ 49

X.   CERTIFICATE THAT BRIEF IS VIRUS FREE ..................................................... i

XI.   CERTIFICATE OF COMPLIANCE ....................................................................... i

XII.   CERTIFICATE OF SERVICE ............................................................................... ii

Appellate Case: 23-1087   Page: 4   Date Filed: 03/06/2023 Entry ID: 5251865

# III. TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986) ............................................ 28

*Bachelder v. America W. Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001) ..................... 39

*Baker v. Silver Oak Senior Living Management, Co., L.C.*, 581 F.3d 684, 689 (8th Cir. 2009) ................................................................................................................. 9, 52

*Ballato v. Comcast Corp.*, 676 F.3d 768 (8th Cir. 2012) .................................................. 29, 37

*Beekman v. Nestle Purina Petcare Co.*, 635 F.Supp. 2d 893 (N.D. Iowa 2009) ................... 34

*Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) ...................................................... 48

*Brown v. Diversified Distribution Systems, LLC*, 801 F.3d 901, 909 (8th Cir. 2015) ....... 8, 42

*Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 676-77 (8th Cir. 2000) ...................... 8, 40

*Clinkscale v. St. Therese of New Hope*, 701 F.3d 825, 828 (8th Cir. 2012) ............... 8, 36, 37

*DaPrato v. Massachusetts Water Resources Authority*, 482 Mass. 375, 390-391 (2019) . 38, 39, 43

*Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) ............................................................ 39

*Dillaway v. Ferrante*, No. Cir. 02-715 (JRT/JSM), 2005 WL 23109696 at *5 (D.Minn. Dec. 9, 2003) .......................................................................................................................... 39

*E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 969-70 (8th Cir. 2014) ..................... 49

*Gardner v. Wal-Mart Stores, Inc.*, 2 F 4th 745, 748 (8th Cir. 2021) .................................. 51

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ...................................... 45

iv

*Gruttemeyer v. Transit Authority*, 31 F.4th 638, 648 (8th Cir. 2022) ................................. 48

*Guthrie v. J.C. Penney, Inc.*, 803 F.2d 202, 207 (5th Cir. 1986) ............................................ 28

*Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) ...................................................... 27

*Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998) ...................... 37, 38

*Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 867 (8th Cir. 2015) ....................... 8, 44

*Johnson v. Dollar General*, 880 F.Supp.2d 967, 985 (N.D. Iowa 2012) ............................. 30

*Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833-34 (8th Cir. 2000) ......9, 46, 47

*Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) ................................... 51

*Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 305 (3rd Cir. 2012) ... 31,
35

*Lors v. Dean*, 746 F.3d 857, 865-66 (8th Cir. 2014) ............................................................. 49

*Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012) ............................ 29

*Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996) ...................................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ..................... 28

*Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640-641 (8th Cir. 2002) ............................................... 48

*Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 921 (8th Cir. 2018) ............. 45

*Phillips v. Mathews*, 547 F.3d 905 (8th Cir. 2008) ................................................................. 30

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996 (8th Cir. 2012) ......................... 39

*Rankin v. Seagate Technologies, Inc.*, 246 F.3d 1145, 1148-49 (8th Cir. 2001) ................... 30

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) .............................. 28

*Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996) ............................. 28

Appellate Case: 23-1087      Page: 6      Date Filed: 03/06/2023 Entry ID: 5251865

*Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) ...................... 31

*Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002) ............................. 39, 50

*Smith v. AS America, Inc.*, 829 F.3d 616, 621 (8th Cir. 2016) ............................................. 29

*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002) ........... 36

*Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002) ..... 31

*Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001) 50

*Stallings v. Hussmann Corp.*, 447 F.3d 1041 (8th Cir. 2006) ........................................passim

*Staub v. Procter Hosp.*, 562 U.S. 411, 422 (2011) ............................................................ 9, 47

*Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) ........ 35, 36

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) ............................ 46, 49

*Vance v. Ball State Univ.*, 570 U.S. 421, 446-447 (2013) ...................................................... 47

*Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018) ........... 9

*Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2004) .................................... 27

**Statutes**

28 U.S.C. § 1331 ....................................................................................................................... 6

28 U.S.C. § 1367 ....................................................................................................................... 7

28 U.S.C. §1291 ........................................................................................................................ 7

29 U.S.C. § 12101 ..................................................................................................................... 6

29 U.S.C. § 2601 ....................................................................................................................... 6

29 U.S.C. § 2612 ................................................................................................................ 28, 29

Appellate Case: 23-1087     Page: 7     Date Filed: 03/06/2023 Entry ID: 5251865

29 U.S.C. § 2617 ................................................................38, 43

Neb. Rev. Stat. § 48-1101 ........................................................ 7

**Rules**

Fed. R. Civ. P. 37(c)(1) ........................................................... 9

Fed. R. Civ. P. 56(c) .............................................................. 27

**Regulations**

29 C.F.R. § 825.110 .............................................................. 29

29 C.F.R. § 825.115 .............................................................. 30

29 C.F.R. § 825.302 .............................................................. 32

29 C.F.R. § 825.303 ..........................................................passim

Appellate Case: 23-1087    Page: 8    Date Filed: 03/06/2023 Entry ID: 5251865

# IV. JURISDICTIONAL STATEMENT

The District Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331, because Tonya's claims arise under the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 12101 *et seq.*, and the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* The District Court has supplemental jurisdiction over Tonya's Nebraska state law claims under the Nebraska Fair Employment Practices Act ("NFEPA"), Neb. Rev. Stat. § 48-1101 *et seq.*, pursuant to 28 U.S.C. § 1367.

On January 17, 2023, the United States District Court for the District of Nebraska, Hon. Robert F. Rossiter, Jr., issued an order of final judgment granting Westar's Motion for Summary Judgment and dismissing Tonya's case. The same day, the Clerk of Court entered judgment and Tonya timely filed her Notice of Appeal.

The Eighth Circuit Court of Appeals has jurisdiction over the appeal of the District Court's dismissal of Tonya's claims pursuant to 28 U.S.C. §1291.

The district court denied Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike ("Plaintiff's Motions"), but both motions were already rendered moot by the District Court's order granting Westar's Motion for Summary Judgment and dismissing Tonya's case.

1

# V. STATEMENT OF ISSUES – APPOSITE CASES

1. Whether the District Court erred by dismissing Tonya's FMLA interference claim on summary judgment when Tonya suffered a diabetic emergency resulting in sudden incapacity, she provided Westar notice of her need for protected leave as soon as she regained cognitive function, and Westar fired Tonya based on its belief she violated call-in procedures more stringent than the notice requirements of the FMLA.

   *Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 676-77 (8th Cir. 2000)

   *Clinkscale v. St. Therese of New Hope*, 701 F.3d 825, 828 (8th Cir. 2012)

   29 C.F.R. § 825.303

2. Whether the District Court erred by dismissing Tonya's FMLA retaliation claim on summary judgment when Tonya exercised her rights under the FMLA by seeking emergency medical treatment instead of appearing for her scheduled shift, and Westar admits it fired Tonya based on its belief she violated call-in procedures more stringent than the notice requirements of the FMLA.

   *Brown v. Diversified Distribution Systems, LLC*, 801 F.3d 901, 909 (8th Cir. 2015)

   *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 867 (8th Cir. 2015)

   *Stallings v. Hussman Corp.*, 447 F.3d 1041 (8th Cir. 2006)

   29 U.S.C. § 2617

Appellate Case: 23-1087    Page: 10    Date Filed: 03/06/2023 Entry ID: 5251865

3. Whether the District Court erred by dismissing Tonya's disability discrimination claim on summary judgment when an individual directly involved in Westar's termination decision expressed disdain for Tonya's requests for accommodations, disclosure of her disability, and need for leave, and Westar decided to terminate Tonya within 30 minutes of disclosing her disability and need for leave for her disability.

*Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833-34 (8th Cir. 2000)

*Staub v. Procter Hosp.*, 562 U.S. 411, 422 (2011)

*Baker v. Silver Oak Senior Living Management, Co., L.C.*, 581 F.3d 684, 689 (8th Cir. 2009)

4. Whether Plaintiff's Partial Motion for Summary Judgment and Plaintiff's Motion to Strike were rendered moot when the District Court granted Defendant's Motion for Summary Judgment, thus depriving the District Court of jurisdiction to deny either motion, or in the alternative, whether the District Court improperly denied Plaintiff's Partial Motion for Summary Judgment and Plaintiff's Motion to Strike.

Fed. R. Civ. P. 37(c)(1)

*Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018)

3

# VI.    STATEMENT OF THE CASE

## A. Substantive Facts

Tonya Huber ("Tonya") moved around the country throughout her life before eventually making a home in Omaha, Nebraska, with her son, Trey Huber. (APP.VOL II 220, R. Doc. 42-2, at 2, 8:11; 8:12-20; 7:16-19). Even though she raised her son on her own, Tonya also earned a bachelor's degree in project management and master's degree in business administration from St. Thomas University. (APP.VOL II 222, R. Doc. 42-2, at 4, 15:16-16:25). Before Westar hired her, Tonya already had approximately 15 years' experience in management roles in the fast-food industry, having previously worked for Tri City Foods, a franchisee of Burger King, and Winfield, a franchisee of Wendy's. (APP.VOL II 221-222, R. Doc. 42-2, at 3-4, 12:24-13:2; 13:20-21; 9:11-20; 13:3-8). Tonya was often dispatched to overhaul stores in challenging districts, with poor track records, essentially giving them a makeover so they could improve inspection ratings and overall operational function. (APP.VOL II 221, R. Doc. 42-2, at 3, 10:2-24). While working for Winfield, Tonya trained store managers, while continuing to manage her own store. (APP.VOL II 222, R. Doc. 42-2, at 4, 13:13-17).

Westar owns and operates seven Hardee's locations in Nebraska and employed over 200 people when Tonya worked for the company. (APP.VOL I 12, R. Doc. 1, at 1, 25). Westar hired Tonya to work in its Elkhorn, Nebraska location as a Store Manager in December 2018. (APP.VOL II 225, R. Doc. 42-2, at 7, 27:15-25); (APP.VOL II 394, R. Doc. 42-5, at 25, 98:17-21). When Tonya was hired, Westar's Elkhorn location had

4

recently failed an inspection, so Westar tasked Tonya with bringing its "problem store" back in line. (APP.VOL II 225, R. Doc. 42-2, at 7, 27:17-28:2).

Three different Westar district managers supervised Tonya during her employment with Westar: Stacy Holtz from January through mid to late February 2019; Matt Thayer ("Thayer") from mid to late February 2019 through September 2019; and Cindy Kelchen ("Kelchen") from September 2019 through December 26, 2019. (APP.VOL II 376, R. Doc. 42-5, at 7, 27:22-28:25); (APP.VOL II 378, R. Doc. 42-5, at 9, 35:16-20); (APP.VOL II 315, R. Doc. 42-3, at 8, 29:7-25).

Within a few months of starting at Westar, Tonya was diagnosed with diabetes. (APP.VOL II 237, R. Doc. 42-2, at 19, 73:8-19). In about March 2019, Tonya began taking insulin shots once per day. (APP.VOL II 237, R. Doc. 42-2, at 19, 73:20-74:12). She needed to take her insulin while she ate, at work. (APP.VOL II 237, R. Doc. 42-2, at 19, 74:6-12).

Tonya requested minor accommodations for her diabetes during her employment at Westar. Specifically, Tonya needed to be able to store her insulin at room temperature while she was at work. (APP.VOL II 237, R. Doc. 42-2, at 19, 76:15-17). If Tonya's insulin was stored at too high or low a temperature, it would lose effectiveness. (APP.VOL II 238-39, R. Doc. 42-2, at 20-21, 80:21-81:1). Westar's Elkhorn location ran hot. Tonya took daily temperature readings throughout the store as part of her daily duties, and the kitchen and office were regularly above 90 degrees. (APP.VOL II 238, R. Doc. 42-2, at 20); (APP.VOL II 237, R. Doc. 42-2, at 19, 78:12-

5

17; 76:15-78:3). Tonya asked for help from her district manager, Thayer, who said, "that's a [you] problem, not a [me] problem." (APP.VOL II 239, R. Doc. 42-2, at 21, 81:4-6). When Tonya started reporting to Kelchen, she asked Kelchen for help. (APP.VOL II 239, R. Doc. 42-2, at 21, 81:6-7). Kelchen advised Tonya to store her insulin in the freezer. *Id.* When Tonya pointed out that a freezer is not room temperature, Kelchen told Tonya, "then I don't know what to tell you." (APP.VOL II 239, R. Doc. 42-2, at 21, 81:6-9). After months of trial and error, one of Tonya's employees noticed the store safe was a moderate temperature, and she began storing her insulin there. (APP.VOL II 239, R. Doc. 42-2, at 21, 84:12-14); (APP.VOL II 239, R. Doc. 42-2, at 21, 81:9-14). As a direct result of Westar's ambivalence, Tonya was unable to bring her insulin to work from March through September 2019. (APP.VOL II 239, R. Doc. 42-2, at 21, 81:21-24; 81:25-82:4); 81:15-20).

Until she needed time off in December 2019, the only other accommodation Tonya requested from Westar was that it provide support so she could take time to eat during her shift. (APP.VOL II 237, R. Doc. 42-2, at 19, 76:5-14). Tonya's shifts started early in the morning, and she worked until at least 3:00 p.m., sometimes later. (APP.VOL II 239-240, R. Doc. 42-2, at 21-22, 84:22-85:15). Tonya quickly noticed balancing her duties left her without time to eat during her shift. *Id.* When Tonya requested Kelchen's assistance, she offered no support, instead instructing Tonya to be better at time management. (APP.VOL II 240, R. Doc. 42-2, at 22, 85:15-19). Kelchen claims she did not know Tonya was diabetic while Tonya worked at Westar, and denies

6

ever discussing Tonya's accommodations. (APP.VOL II 329-30, R. Doc. 42-2, at 11-12, 88:16-21; 89:15-91:7).

Tonya received an Employee Coaching Tool in January 2019 when, admittedly, Tonya did not notify her supervisor, Stacy Holtz, that she had gotten sick and left her store in the care of shift manager, Stephen Malloy. (APP.VOL II 227, R. Doc. 42-2, at 9, 33:21-37:10). Westar's Attendance and Punctuality Policy states the following:

> If you are going to be late for work or will not be able to work, call the management person in charge immediately so that enough time is given to cover your position. You must call and speak directly to the management person in charge. Texting, emailing or leaving a message is not acceptable. You must call at least two-hours before your work shift begins when possible. This will give adequate time to cover your position.

(APP.VOL I 60, R. Doc. 39-3, at 2). In Tonya's previous roles, this type of communication was not necessary for a store manager, as long as the store had coverage. (APP.VOL II 228-229, R. Doc. 42-2, at 10-11, 40:25-41:11). Even so, Tonya took responsibility for her violation and moved forward with no further write-ups under her subsequent supervisor, Thayer. (APP.VOL II 378, R. Doc. 42-5, at 9, 35:21-24).

Westar also issued written discipline to Tonya in October 2019 for an alleged violation of Westar's call-in policy. Tonya began experiencing vomiting and diarrhea when she went in for her scheduled shift on October 31, 2019, so she waited for another responsible employee to arrive at the store and then went to the hospital. (APP.VOL II 233, R. Doc. 42-2, at 15, 57:15-18; 59:15-20). Tonya sent out a text message to all

7

district managers requesting assistance, and indicating she was working with a high fever, but no one responded to Tonya's message. (APP.VOL I 91, R. Doc. 39-13, at 1). Tonya called Kelchen to let her know she would be leaving, but Kelchen did not answer, so Tonya left her a voicemail. (APP.VOL II 232, R. Doc. 42-2, at 14, 56:14-20). Tonya also called Kelchen from the parking lot of the hospital, immediately after her discharge. (APP.VOL II 236, R. Doc. 42-2, at 18, 69:7-16). Kelchen does not believe Tonya called her before leaving her shift. (APP.VOL II 325, R. Doc. 42-3, at 18, 71:2-8).

Tonya's diabetes was well controlled until December of 2019. On December 20, 2019, Tonya woke up at 3:30 a.m. for her shift. (APP.VOL II 241, R. Doc. 42-2, at 23, 90:12-17). Tonya felt "out of it," her blood sugar was in the low 60s, and she "didn't know what-who I was, what I was, where help was." (APP.VOL II 241, R. Doc. 42-2, at 23, 90:22-25). She describes looking down at her work uniform, realizing she was supposed to be heading to work, walking into the front room of her home, and then forgetting what was happening and where she was supposed to be. (APP.VOL II 241, R. Doc. 42-2, at 23, 91:2-10). Tonya managed to drive herself to her doctor's office, where she spent the remainder of the day hooked up to an IV. (APP.VOL II 241, R. Doc. 42-2, at 23, 92:10-21). She was given medication with a sedative effect, to assist in getting her blood sugars under control, so she continued to feel groggy throughout the day and evening. (APP.VOL II 247, 42-2, at 29, 114:8-13). Tonya was released after the clinic closed at 5:30, but her doctor's staff would not let her drive, so her boyfriend, Richard Grondin ("Grondin") picked her up. (APP.VOL II 241-42, R. Doc. 42-2, at

8

23-24, 92:23-93:2; 93:24-94:4); (APP.VOL II 541, R. Doc. 44-4, at 6, 24:2-8). Tonya couldn't convey her location to Grondin, so he had to use an app to locate her. (APP.VOL II 246, R. Doc. 42-2, at 28, 111:13-21). When Grondin picked Tonya up he recalled, "[s]he looked very tired, very weak, in and out, not really coherent, but – you know, having even thoughts, but then not, you know." (APP.VOL II 541, R. Doc. 44-4, at 6, 23:21-25).

According to phone records, at various times during the day on December 20, Tonya spoke to her son, Trey Huber, and her boyfriend, Richard Grondin, but she has no independent recollection of those phone conversations. (APP.VOL I 65, R. Doc. 39-6, at 3); (APP.VOL II 241, R. Doc. 42-2, at 23, 91:17-21); (APP.VOL II 245-46, R. Doc. 42-2, at 27-28, 108:2-109:2). Grondin recalls talking to Tonya early in the morning, at about 4:30 a.m., and he does not remember being concerned about Tonya based on that conversation. (APP.VOL II 549, R. Doc. 44-4, at 14, 56:6-22). Grondin's account is consistent with Tonya's testimony that she was already in her work uniform by the time she became confused and delirious. (APP.VOL II 241, R. Doc. 42-2, at 23, 91:2-10). In all subsequent calls on December 20, 2019, Tonya was not making sense, and was having significant difficulty with basic communication. At one point, she apparently told Trey she was at the hospital, because that's where she thought she was, even though she had driven herself to her doctor's office. (APP.VOL II 242, R. Doc. 42-2, at 24, 93:13-20); (APP.VOL II 560, R. Doc. 44-5, at 2, 7:2-8). Trey recalls he couldn't really understand Tonya because her words were "all over the place." (APP.VOL II 560, R.

9

Doc. 44-5, at 2, 7:2-8). Grondin remembers that when he spoke to Tonya that day, "she was very groggy, out of it." (APP.VOL II 541, R. Doc. 44-4, at 6, 23:8-12).

While Tonya was at her doctor's office, Kelchen received a guest complaint that Westar's Elkhorn Hardee's was not open. (APP.VOL II 331, R. Doc. 42-3, at 24, 94:13-17). Kelchen called the restaurant and Tonya, but no one responded, so she called one of Westar's shift leaders to come to cover Tonya's shift. (APP.VOL II 331, R. Doc. 42-3, at 24, 94:17-23). Kelchen was ultimately able to get in touch with Trey Huber, Tonya's emergency contact. (APP.VOL II 331, R. Doc. 42-3, at 24, 94:25-95:7). Trey told Kelchen his mom was at the doctor and she "would give any updates when she could." (APP.VOL II 561, R. Doc. 44-5, at 3, 10:1-5). Or, as Kelchen recalls it, Trey said Tonya "was in the hospital and she would call me back later." (APP.VOL I 92, R. Doc. 39-14, at 1).

Later that day, Grondin drove from his home in Grand Island to Omaha to pick Tonya up at the doctor's office. (APP.VOL II 542, R. Doc. 44-4, at 7, 27:16-25). Grondin drove Tonya directly to her apartment, dropped her off, and went to the pharmacy to pick up Tonya's prescriptions. (APP.VOL II 542, R. Doc. 44-4, at 7, 28:8-15). Tonya was so delirious Grondin decided to stay overnight, sleeping on the couch to ensure she would get sufficient rest. (APP.VOL II 542, R. Doc. 44-4, at 7, 28:16-29:6). The two couldn't even really talk, because Tonya was so disoriented by the effects of her medication. (APP.VOL II 543, R. Doc. 44-4, at 8, 29:7-15).

10

Immediately upon waking up on December 21, 2019, and before she even left her bedroom, Tonya texted Kelchen her doctor's note, placing her off work until December 26, 2019, and called Kelchen on her cell phone. (APP.VOL II 543, R. Doc. 44-4, at 8, 31:23-32:1); (APP.VOL I 63, R. Doc. 39-6, at 3); (APP.VOL II 247, 42-2, at 29, 114:14-19); (APP.VOL II 567, R. Doc. 44-6, at 1, ¶5); (APP.VOL II 569, R. Doc. 44-7, at 1). Tonya does not remember much from her call with Kelchen, because she was still recovering from the medications she received at her doctor's office. (APP.VOL II 254, R. Doc. 42-2, at 36, 143:12-21). Grondin, however, recalls being woken up from his sleep by Kelchen "screaming" at Tonya from the other end of the phone, while Tonya tried to explain her absence. (APP.VOL II 540, R. Doc. 44-4, at 5, 17:7-11; 17:19-18:3). In Kelchen's contemporaneously recorded notes from this conversation, she recounts the following:

> She woke up not feeling good. She banged on her son's bedroom door but he didn't answer. She said she drove herself to the doctor's office. I asked her how did you drive yourself to the doctor and she said well it was only 2 blocks away to get there. When she got there, her levels of her diabetic was off. It wasn't good. They wanted to put her in the ER but she refused and was just treated there at clinic. She proceeded to tell me they gave her a shot and medication to get it in line as her sugar level was dropping.
>
> ****
>
> I said, so why didn't you call me on all that was going on. She said I was just too drugged out, couldn't concentrate, and I would contact you later. I then asked why didn't you have your son, or nurse contact me. She (Tonya), knew the call needed to come from her she said. Tonya then said the doctor notes is attached you see it. I said yes. Tonya then

11

> said, I have a follow up on Monday and I can return on the
> 26th, Thursday. I said okay. I told Tonya we had this
> conversation about communication and needing to make
> that simple phone call. Did you know our restaurant didn't
> open til 11:30. There was no contact to anyone? Tonya then
> told me you see the note, of why. I was having a serious
> medical happening. You can google and see what happens;
> out of it, not making sense, and can't concentrate.

(APP.VOL I 92, R. Doc. 39-14, at 1). At the close of this conversation, Kelchen instructed Tonya to meet her at Westar's Elkhorn location on December 26, 2019 at 3:00 p.m. (APP.VOL II 254, R. Doc. 42-2, at 36, 143:12-16).

After Kelchen's conversation with Tonya, Kelchen had a six-minute phone conversation with Westar's owner, Frank Westermajer. (APP.VOL II 338, R. Doc. 42-3, at 31, 123:8-13); (APP.VOL I 185, R. Doc. 39-16, at 3). During this call, based only on what Kelchen reported to him, Westermajer decided to fire Tonya. (APP.VOL II 338, R. Doc. 42-3, at 31, 123:8-21); (APP.VOL II 339, R. Doc. 42-3, at 32, 125:3-12; 125:21-25). Kelchen contacted Amy Rowe ("Rowe"), Westar's HR advisor, and Rowe drafted Tonya's termination form based on information provided by Kelchen. (APP.VOL II 341, R. Doc. 42-3, at 34, 136:1-13); (APP.VOL II 387, R. Doc. 42-5, at 18, 71:22-72:21). Neither Rowe nor Westermajer spoke with Tonya prior to deciding to terminate her. (APP.VOL II 390, R. Doc. 42-5, at 21, 84:8-11); (APP.VOL II 256, R. Doc. 42-2, at 38, 149:2-6).

Grondin recalls on December 21, 2019, he had to help Tonya to piece together the events of the previous day, because "she had blanked out a lot of it." (APP.VOL II

12

543, R. Doc. 44-4, at 8, 32:12-17). On the afternoon of December 21, Grondin drove Tonya to his home in Grand Island to care for her over the weekend. (APP.VOL II 544, R. Doc. 44-4, at 9, 33:8-14). Grondin took hourly blood sugar readings of Tonya, because they could not keep Tonya's sugars in a safe range. (APP.VOL II 546, R. Doc. 44-4, at 11, 44:2-4). Over the weekend, due to her rapidly fluctuating blood sugar, Tonya was nauseous, vomiting, and even experienced incontinence, requiring her to wear a diaper. (APP.VOL II 255, R. Doc. 42-2, at 37, 146:2-11). Tonya's levels continued to drop, raising concerns her pancreas was not functioning properly. (APP.VOL II 546, R. Doc. 44-4, at 11, 43:13-19). Grondin noticed when Tonya's levels dropped, she was noticeably impaired, and "she would get very sluggish, speech was kind of in and out, you know, and that's when it really dropped low." (APP.VOL II 547, R. Doc. 44-4, at 12, 45:1-6; 45:11-14). Tonya's brain couldn't seem to communicate with her body, and she lost dexterity and fine motor function. (APP.VOL II 547, R. Doc. 44-4, at 12, 45:15-23).

Over the next few days, Tonya requested Westar provide her with FMLA paperwork four separate times. On December 22, 2019 at 7:57 p.m., Tonya requested Westar provide her with FMLA paperwork. (APP.VOL I 67, R. Doc. 39-8, at 1). Tonya had a follow-up appointment scheduled for December 23, 2019, and she wanted to provide her doctor FMLA forms to be completed prior to the Christmas holiday. (APP.VOL I 67, R. Doc. 39-8, at 1). On December 23, 2019 at 10:37 a.m., Tonya reiterated her request and reminded Westar of her follow-up appointment that day.

(APP.VOL I 69, R. Doc. 39-9, at 2). After Tonya's second request, Westar's HR representative, Amy Rowe, replied that Westar already had Tonya's doctor's note, and did not need anything further from Tonya's doctor. (APP.VOL I 69, R. Doc. 39-9, at 2).

After Tonya's December 23, 2019 appointment, she again requested FMLA paperwork, indicating her doctor recommended she obtain FMLA forms. (APP.VOL I 68-69, R. Doc. 39-9, at 1-2). In response, Rowe requested Tonya make herself available for a phone call in the afternoon on December 24, even though Rowe knew Tonya's doctor had already taken her off work through December 26. (APP.VOL I 68, R. Doc. 39-9, at 1); (APP.VOL II 569, R. Doc. 44-7, at 1). Tonya declined the meeting due to her continuing illness, and provided an updated doctor's note indicating she was suffering from "acute illness, hypoglycemia, fever, and debility related to above," and excusing her from work through January 2, 2020. (APP.VOL I 68-70, R. Doc. 39-9, at 1-3). Yet again, Tonya requested FMLA paperwork for her condition. (APP.VOL I 68, R. Doc. 39-9, at 1).

Kelchen expressed frustration over accommodating Tonya's leave request. When asked whether Tonya was on the schedule after Westar received her doctor's note excusing her from work, Kelchen stated, "[i]f a doctor's note excused her, then I had to excuse her." (APP.VOL II 342, R. Doc. 42-3, at 35, 139:15-25). Kelchen also felt it was Tonya's responsibility to staff her restaurant, even while on leave:

14

> They have to help – as a general manager, you also need to
> help cover your shift, as well. So it's a conversation and a
> communication between us going we've got – the
> responsibility of a general manager still is to make sure that
> their shifts are all covered. So it would have still been her
> responsibility to help between her and I to communicate on
> having shift coverage on that restaurant.

(APP.VOL II 342, R. Doc. 42-3, at 35, 140:8-20). Though Kelchen subsequently

attempted to correct herself, this same attitude is reflected in Kelchen's notes regarding

the days surrounding Tonya's absence. (APP.VOL II 342-343, R. Doc. 42-3, at 35-6,

140:21-141:6). In her notes Kelchen wrote:

> At 10:04am, Tonya responds back with an email on her
> condition and not able to talk with us. We then received
> another not of work release [sic] until Jan. 2nd. *No
> communication to us for her store responsibilities and coverage.*

(APP.VOL I 93, R. Doc. 39-14, at 2) (emphasis added).

After Tonya requested FMLA leave, Westermajer, Kelchen, and Rowe consulted,

and Westermajer elected to move forward with Tonya's termination. (APP.VOL II 389,

R. Doc. 42-5, at 20, 79:5-80:1).

On December 26, 2019, Westar fired Tonya while she was still on leave receiving

ongoing treatment for her uncontrolled diabetes. (APP.VOL II 411-413, R. Doc. 42-6,

at 1-3). Westar's stated reason for terminating Tonya was her alleged failure to contact

Kelchen to notify Westar of her absences on December 20 and 21, 2019. (APP.VOL II

413, R. Doc. 42-6, at 3). Westar denied Tonya's request for FMLA leave in her

termination letter. (APP.VOL II 413, R. Doc. 42-6, at 3). Westar indicated it denied

Tonya's FMLA request because Tonya failed to contact Westar to notify it of her absence "as soon as possible and practical." (APP.VOL II 413, R. Doc. 42-6, at 3). According to Westar, because Tonya was able to drive herself to her doctor during her diabetic emergency, she should have been able to call her boss. (APP.VOL II 413, R. Doc. 42-6, at 3). Westar did not consider whether Tonya's FMLA leave request had any impact on Tonya's termination. (APP.VOL II 341, R. Doc. 42-3, at 34, 133:10-134:4).

After Westar fired her, Tonya applied for and received unemployment benefits from the state of Nebraska. (APP.VOL III 224, R. Doc. 42-2, at 6, 22:13-17). As a requirement of obtaining unemployment benefits, Ms. Huber used the Nebraska Department of Labor job search website to regularly apply to jobs from January 2020 through June 2021. (APP.VOL III 277, R. Doc. 42-2, at 59, 233:1-20) (APP.VOL II 414-419, R. Doc. 42-7, at 1-6). In addition to applications submitted through the Nebraska Department of Labor website, Ms. Huber separately applied to a significant number of jobs on her own. The record in this case contains over 700 pages of job applications and job-related correspondence that document a portion of Ms. Huber's job search. (APP.VOL II 218, R. Doc. 42-1, at 2, ¶10).

Throughout her job search process, Tonya applied for jobs commensurate with her educational background and her professional experience, including some management roles in the food industry, as well as management roles in other industries. (APP.VOL II 420, R. Doc. 42-8, at 1, ¶¶7-8) (APP.VOL II 252-253, R. Doc. 42-2, at 34-35, 136:12-139:5). Tonya estimates she applied for, at least, ten jobs per week during

16

the period beginning January 17, 2020 and ending June 20, 2021. (APP.VOL II 420, R. Doc. 42-8, at 1, ¶6). Her Nebraska Department of Labor job search log shows she applied for over 500 jobs during the same time period. (APP.VOL II 420, R. Doc. 42-8, at 1, ¶5).

Tonya also enrolled in classes at Metropolitan Community College to bolster her resume and obtain employment, even taking an unpaid internship to try to get a job. (APP.VOL II 421, R. Doc. 42-8, at 2, ¶¶15; 17). When the unpaid internship did not become a paid position, Tonya left to search for a paying job. (APP.VOL II 421, R. Doc. 42-8, at 2, ¶18). Tonya never turned down a job offer from January 2020 through September 2022. (APP.VOL II 421, R. Doc. 42-8, at 2, ¶19).

Ms. Huber remained ready, willing, and able to work from January 2020 through September 2022. (APP.VOL II 421, R. Doc. 42-8, at 2, ¶20). Throughout this application process, Ms. Huber had many interviews but was not able to find another job until September 7, 2022. (APP.VOL II 223, R. Doc. 42-2, at 5, 19:2-7) (APP.VOL II 422, R. Doc. 42-8, at 3, ¶¶22-24).

At the outset of Tonya's case, Westar served Rule 26(a) disclosures identifying individuals with discoverable information it may use to support its claims or defenses. (APP.VOL III 708-709, R. Doc. 56-3, at 1-2). Westar disclosed Rowe had "[k]knowledge of Plaintiff's termination and of Defendant's policies and procedures," and Kelchen had "[k]nowledge of Plaintiff's work performance at relevant times." (APP.VOL III 708, R. Doc. 56-3, at 1). Westar failed to identify Rowe and Kelchen in

17

its responses to Plaintiff's discovery requests regarding Westar's mitigation of damages defense, and in response to Plaintiff's discovery requests regarding expert witnesses. (APP.VOL III 714, R. Doc. 56-4, at 2); (APP.VOL III 717-718, R. Doc. 56-4, at 5-6). Both Rowe and Kelchen were deposed, and were questioned based on the information Westar provided in its disclosures and discovery responses. (APP.VOL II 308-366, R. Doc. 42-3, at 1-59, 370-410).

In response to Plaintiff's Motion for Partial Summary Judgment Westar filed the Affidavit of Amy Lyn Rowe and the Affidavit of Cindy Kelchen. (APP.VOL III 637-639, R. Doc. 47-2, at 1-3); (APP.VOL III 640-642, R. Doc. 47-3, at 1-3). Both affidavits contained testimony Westar never previously disclosed. (APP.VOL III 708-712, R. Doc. 56-3, at 1-3); (APP.VOL III 713-720, R. Doc. 56-4, at 1-8); (APP.VOL III 721-725, R. Doc. 56-5, at 1-5); (APP.VOL III 706-707, R. Doc. 56-2, at 1-2).

## B. Procedural Background

Tonya filed her Complaint on June 17, 2021, alleging Westar violated the ADA Amendments Act of 2008 ("ADA") and Nebraska Fair Employment Practices Act ("NFEPA") when it discriminated against her based on her disability – diabetes – by denying her requests for accommodations and firing her due to her need for time off to receive treatment for a diabetic emergency. (APP.VOL I 9, R. Doc. 1, at 1, 14-17). Tonya further alleged Westar interfered with her rights and retaliated against her in violation of the Family Medical Leave Act of 1993 ("FMLA") when it denied her FMLA request and terminated her for taking protected leave. *Id.* 17-18.

Appellate Case: 23-1087    Page: 26    Date Filed: 03/06/2023 Entry ID: 5251865

Westar filed its Motion for Summary Judgment on all of Tonya's claims on September 9, 2022. (APP.VOL I 33, R. Doc. 38, at 1). Tonya filed Plaintiff's Motion for Partial Summary Judgment the same day, requesting summary judgment in her favor as to Westar's affirmative defenses of failure to mitigate damages and after-acquired evidence. (APP.VOL I 204, R. Doc. 41, at 1). On October 11, 2022, Tonya filed Plaintiff's Motion to Strike, requesting the District Court strike two affidavits Westar filed in opposition to Plaintiff's Motion for Partial Summary Judgment, based on Westar's failure to disclose the testimony submitted in these affidavits prior to filing them with the District Court. (APP.VOL III 701-702, R. Doc. 55, at 1-2).

On January 17, 2023, the District Court issued its Memorandum and Order, granting Westar's Motion for Summary Judgment, denying Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike, and dismissing Tonya's case, with prejudice. (APP.VOL III 745-758, R. Doc. 66, at 1-14). Though the District Court's Order denied Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike, it did not analyze the substance of either motion in its written opinion. *Id.* The District Court entered Judgment in favor of Westar and against Tonya on January 17, 2023. *Id.* 759. Tonya filed her Notice of Appeal the same day. *Id.* 760.

## VII.   SUMMARY OF THE ARGUMENT

Tonya Huber's claims of interference and retaliation under the FMLA and discrimination under the ADA were improperly dismissed by the District Court on a

19

motion for summary judgment by Westar. In making its decision, the District Court impermissibly relied on Westar's self-professed "good faith belief" that Tonya violated its attendance policy as an independent reason for termination. Because the District Court ignored this Court's precedent holding an employer's intent is not relevant to its liability under the FMLA, its decision should be reversed. Additionally, in analyzing both Tonya's FMLA retaliation claim and disability discrimination claim, the District Court disregarded evidence of discriminatory animus on the part of Kelchen, a Westar supervisor intimately involved in the decision to terminate Tonya, because she was, allegedly, not the ultimate decisionmaker. Kelchen's attitude towards Tonya's exercise of her protected rights under the FMLA is directly relevant to assessing Westar's true motives, because the ultimate decisionmaker relied exclusively on information from Kelchen, and she was consulted in the decisionmaking process. Finally, Westar's stated reason for firing Tonya – that she violated its policies – is directly related to her protected activity under the FMLA and her disability. Factual disputes between the parties on all of Tonya's claims should have precluded summary judgment, and warrant reversal of the District Court's decision.

Additionally, the District Court denied Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike ("Plaintiff's Motions"), without indicating those denials were based on mootness. The District Court did not need to decide either of Plaintiff's Motions once it dismissed Tonya's claims in their entirety, so it lacked jurisdiction to substantively rule on either motion. Accordingly, Tonya respectfully

requests this Court reverse the District Court's denial of Plaintiff's Motions and remand for a substantive decision by the District Court. In the alternative, if this Court determines the District Court had jurisdiction to deny Plaintiff's Motions, Tonya respectfully requests this Court reverse the district court's denial of her motions and remand for the District Court to enter an order in her favor.

## VIII. ARGUMENT

### A. Standard of Review for District Court's Dismissal of Tonya's FMLA Interference, FMLA Retaliation, and ADA Discrimination Claims

The Eighth Circuit reviews a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party. *Stallings v. Hussmann Corp.*, 447 F.3d 1041 (8th Cir. 2006). To be entitled to summary judgment, the moving party must prove there are no genuine issues of material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2004). The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (2007)).

A court considering a motion for summary judgment must view all facts in the light most favorable to the nonmoving party and give her the benefit of all reasonable

Appellate Case: 23-1087     Page: 29     Date Filed: 03/06/2023 Entry ID: 5251865

inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir. 1996); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir. 1996). The evidence of the nonmoving party is to be believed. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51 (1986). Evidence by the moving party may be believed but only "to the extent that evidence * * * is uncontradicted and unimpeached * * * [and] comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* Only jurors are entitled to weigh the credibility of witnesses and disregard self-serving testimony. *Guthrie v. J.C. Penney, Inc.*, 803 F.2d 202, 207 (5th Cir. 1986). Thus, at the summary judgment stage, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

The District Court dismissed Tonya's FMLA interference, FMLA retaliation, and disability discrimination claims on summary judgment, so all claims are subject to de novo review.

## B. The District Court Improperly Granted Westar's Motion for Summary Judgment on Tonya's FMLA Interference Claim

The Family Medical Leave Act ("FMLA") protects an employee's job in the event the employee needs to miss work because of her own illness, to care for family members, or to care for a new child. 29 U.S.C. § 2612(a)(1)(A)-(D). The FMLA was

22

enacted to balance the legitimate interests of employers with the workplace needs of families. *Id.* Eligible employees are entitled to up to 12 workweeks of unpaid leave during any 12-month period. *Id.* §2612(a)(1).

To prevail on a claim of FMLA interference[1], an employee must show she was eligible for FMLA leave, she provided notice of her need for leave, and the employer denied her an FMLA benefit to which she was entitled. *See Smith v. AS America, Inc.*, 829 F.3d 616, 621 (8th Cir. 2016); *Lovland v. Employers Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012). "An employee can prevail under an interference theory if he was denied substantive rights under the FMLA for a reason connected with his FMLA leave." *Stallings*, 447 F.3d at 1050. An employer's intent is immaterial in an FMLA interference claim. *Ballato v. Comcast Corp.*, 676 F.3d 768 (8th Cir. 2012).

### 1. Tonya was eligible for FMLA leave.

An employee is eligible for FMLA leave when they suffer from a "serious health condition," which occurs when an individual suffers an "illness, injury, impairment, or physical or mental condition" that requires "inpatient care" or "continuing treatment" by a health care provider. *See* 29 C.F.R. § 825.110(a). The "continuing treatment" prong "is subject to an 'objective test,' requiring the claimant to prove the following: (1) that she had a period of incapacity requiring absence from work, (2) that this period of

---

[1] This is also referred to as an "entitlement claim." *See Pulczkiski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).

Appellate Case: 23-1087     Page: 31     Date Filed: 03/06/2023 Entry ID: 5251865

incapacity exceeded three days, and (3) that she received continuing treatment by a health care provider within the period." *Johnson v. Dollar General*, 880 F.Supp.2d 967, 985 (N.D. Iowa 2012) (cleaned up). Treatment by a health care provider is defined as an in-person visit to a health care provider, with the first or only in-person visit taking place within seven days of the first day of incapacity. *See* 29 C.F.R. § 825.115(a)(3).

Tonya's diabetes and attendant hypoglycemia were serious health conditions. She initially experienced a period of incapacity which her physician felt necessitated her absence from work for 6 days. (APP.VOL II 569, R. Doc. 44-7, at 1). *See Johnson*, 880 F.Supp.2d at 985. She presented to her doctor on the first day she experienced incapacitating symptoms and received in-person treatment with her doctor for the full day. Tonya had a follow-up appointment for further treatment with her doctor on Monday, December 23, 2019, which was during the period of incapacity. Tonya's testimony regarding her own incapacity is sufficient to survive summary judgment on the issue of whether Tonya was eligible for FMLA leave. *See Rankin v. Seagate Technologies, Inc.*, 246 F.3d 1145, 1148-49 (8th Cir. 2001) (plaintiff's affidavit that she was "too sick to work" sufficient to preclude summary judgment regarding incapacity).

## 2. Tonya provided Westar sufficient information to put it on notice of her need for protected leave.

To satisfy the second element of a claim for FMLA interference, an employee must prove she gave notice of her need for FMLA leave. *See Phillips v. Mathews*, 547 F.3d 905 (8th Cir. 2008). An employee does not have to utter the words "Family Medical

Appellate Case: 23-1087   Page: 32   Date Filed: 03/06/2023 Entry ID: 5251865

Leave Act" or "FMLA" to put an employer on notice that the employee's leave may be protected. *See Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002); *see also* 29 C.F.R. § 825.303 ("When an employee seeks leave for the first time for a FMLA–qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA.") Whether an employee provided sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury. *Philips*, 547 F.3d at 909-910. The critical question is "whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007); *see also Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 305 (3rd Cir. 2012) ("The regulations state that if an employee's initial notice reasonably apprises the employer that FMLA may apply, it is the employer's burden to request additional information if necessary.")

Prior to Westar making any termination decision, Tonya provided Westar with the information it needed to be reasonably apprised of her need for FMLA leave. *See Sarnowski, supra.* During Tonya's December 21, 2019 phone call to Kelchen, Tonya notified Kelchen she was incapacitated due to her diabetes, received in-person treatment with her doctor for her incapacity, was placed off work for six days by her doctor, and would return to her doctor within three days of her previous appointment. (APP.VOL I 92, R. Doc. 39-14, at 1). Tonya also provided Westar a doctor's note

25

supporting her absence. (APP.VOL II 567, 44-6, at 1, ¶5); (APP.VOL II 569, R. Doc. 44-7, at 1). Westar can't dispute any of this, because this information is in Kelchen's contemporaneously recorded notes from her phone conversation with Tonya. (APP.VOL I 92, R. Doc. 39-14, at 1). Westermajer allegedly decided to fire Tonya after Kelchen conveyed to him what she learned from Tonya during their December 21 call. (APP.VOL II 338, R. Doc. 42-3, at 31, 123:8-21); (APP.VOL II 339, R. Doc. 42-3, at 32, 125:3-12; 125:21-25). Tonya also explicitly requested FMLA leave paperwork from Rowe, Westar's HR representative, four times before Westar ever conveyed to Tonya that she was being fired. (APP.VOL I 67, R. Doc. 39-8, at 1); (APP.VOL I 69, R. Doc. 39-9, at 1-2). Rowe's only response was to confirm Westar already had all the information it needed. (APP.VOL I 69, R. Doc. 39-9, at 2).

### 3. Tonya provided Westar notice as soon as practicable under emergency circumstances.

Different requirements apply to the timing of the notice an employee must give her employer based on whether her need for leave is foreseeable or unforeseeable. *See* 29 C.F.R. § 825.302 and 29 C.F.R. § 825.303, respectively. When an employee's need for FMLA leave is not foreseeable, as was the case for Tonya, she is required to provide her employer with notice of her need for leave as soon as practicable under the facts and circumstances of the particular case. *Id.* An employer can delay or deny an employee's leave request based on an employee's failure to comply with the employer's usual notice and procedural requirements, unless unusual circumstances justify the

26

employee's failure to comply. *Id.* "[I]f an employee requires emergency medical treatment, he or she would not be required to follow the call-in procedure until his or her condition is stabilized *and* he or she has access to, *and* is able to use, a phone." *Id.* (emphasis added).

Tonya's diabetic emergency was an unusual circumstance rendering her unable to comply with Westar's call-in policy. Although Tonya had access to and use of a phone while she was at her doctor's office on December 20, her condition was not stable. *See* 29 C.F.R. § 825.303(c). Before she went to her doctor's office on December 20, Tonya was disoriented and incoherent. (APP.VOL II 241, R. Doc. 42-2, at 23, 90:22-25). There is no evidence her condition improved as the day went on. Although Tonya used her phone, there is still reason for doubt as to whether she was "able" to do so. By all accounts, Tonya wasn't making any sense in her phone conversations. She told her son, Trey, she was at the hospital, because that's where she thought she was, even though she had driven herself to her doctor's office. (APP.VOL II 242, R. Doc. 42-2, at 24, 93:13-20); (APP.VOL II 560, R. Doc. 44-5, at 2, 7:2-8). Trey had a hard time following what his mom was saying. (APP.VOL II 560, R. Doc. 44-5, at 2, 7:2-8). By the end of the day on December 20, Tonya's condition was so unstable, she was forbidden from driving herself home, because she was sedated. (APP.VOL II 247, R. Doc. 42-2, at 29, 114:8-13); (APP.VOL II 241, R. Doc. 42-2, at 23-24, 92:23-93:2; 93:24-94:4); (APP.VOL II 541, R. Doc. 44-4, at 6, 24:2-8). Tonya couldn't explain her location to

her ride, Grondin, so he had to use an app to pinpoint her location. (APP.VOL II 246, R. Doc. 42-2, at 28, 111:13-21).

Tonya complied with the notice requirements of 29 C.F.R. § 825.303 when, on the morning of December 21, before leaving her bedroom, she reported her illness directly to Kelchen, her supervisor, in compliance with Westar's policy. (APP.VOL II 543, R. Doc. 44-4, at 8, 31:23-32:1); (APP.VOL I 60, R. Doc. 39-3, at 2). Tonya's condition was not stable when she called Kelchen, considering Tonya's blood sugar continued to fluctuate wildly over the weekend, necessitating constant monitoring and hourly blood sugar checks. (APP.VOL II 255, R. Doc. 42-2, at 37, 146:2-11); (APP.VOL II 546, R. Doc. 44-4, at 11, 44:2-4). Nevertheless, Tonya called. Unresolved factual disputes over whether this was as soon as practicable should have precluded summary judgment on Tonya's FMLA interference claim. *See Beekman v. Nestle Purina Petcare Co.*, 635 F.Supp. 2d 893 (N.D. Iowa 2009) (denying employer's motion for summary judgment on FMLA interference claim where parties disputed whether notice was timely provided).

Westar's position is contrary to specific guidance provided in controlling federal regulations. The following example is identified in 29 C.F.R. § 825.303(a):

> [I]f an employee's child has a severe asthma attack and the employee takes the child to the emergency room, the employee would not be required to leave his or her child in order to report the absence while the child is receiving emergency treatment.

28

*Id.* In this example, the parent was physically able to transport their child to an emergency room and support their child while receiving emergency treatment, yet they are excused from notifying their employer of their absence while they are supervising the child's treatment. A more stringent standard should not apply to Tonya, who was able to transport herself to her doctor to receive emergency treatment and was either personally receiving treatment or under the influence of sedatives until the moment she notified her employer. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294 (3rd Cir. 2012)(dispute over whether employee notified employer "as soon as practicable" by calling from emergency room precluded summary judgment).

Based on the standards in the FMLA's implementing regulations, a fact issue remains for trial regarding whether Tonya notified Westar as soon as practicable under the circumstances of her diabetic emergency. Thus, the District Court's decision must be reversed and remanded, so a jury can resolve this factual dispute.

### 4. Westar's application of its Attendance and Punctuality Policy is not an independent reason for termination, because Tonya's inability to follow the policy was due to her qualifying condition.

Even if an employee is entitled to FMLA, an employer can avoid liability for FMLA interference if its "reason for dismissal is insufficiently related to FMLA leave." *Stallings*, 447 F.3d at 1051. "[A]n employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have made the same decision had the employee not exercised the employee's FMLA rights." *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005). The burden is on the employer

29

to show it would have discharged the employee regardless of the employee's request for, or taking of, FMLA leave. *Id.* at 979 (analyzing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002).

For example, in *Throneberry*, an employer was excused from liability under the FMLA when it terminated an employee while on leave, because the employer had a reason for termination wholly unrelated to the employee's leave. 403 F.3d 972. The *Throneberry* plaintiff appeared unsolicited at the hospital where she worked while she was on protected leave. *Id.* She was wearing inappropriate attire and was distracting hospital employees by acting "overmedicated" and erratic. *Id.* at 976. The Eighth Circuit agreed with the district court that, notwithstanding the employee's protected leave, the employer could still terminate the employee based on her bizarre behavior and workplace disruptions. *Id.*

On the other hand, the Eighth Circuit has previously rejected employer's attempts to point to attendance policy violations that are intertwined with an employee's qualifying condition under the FMLA as an independent basis for termination. In *Clinkscale v. St. Therese of New Hope*, 701 F.3d 825, 827-28 (8th Cir. 2012), this Court reversed a district court's grant of summary judgment in favor of an employer in an employee's FMLA interference claim. The *Clinkscale* plaintiff left work unexpectedly due to a serious health condition and was terminated from her job due to leaving her post. The employer argued the *Clinkscale* plaintiff could not have a valid FMLA interference claim, because she was fired for a reason "wholly unrelated" to her FMLA

30

leave -- abandoning her position (and a patient). *Id.* This Court overturned the district court's decision and rejected the employer's "independent reason" for termination, pointing out, "Clinkscale's supposed abandonment, however, was precipitated by a panic attack—a symptom of her anxiety disorder and the reason she required medical leave." *Id.* at 828.

In the present case, as in *Clinkscale*, Tonya's alleged attendance policy violation was intertwined with the very condition for which she required FMLA leave – her diabetic emergency and attendant symptoms. Though a jury may determine Tonya should have been able to call her employer, despite being in the throes of a medical emergency – the interrelatedness of her attendance violation and her debilitating condition preclude summary judgment in Westar's favor.

### 5. Westar cannot avoid liability for its FMLA interference based on its beliefs.

When an employer interferes with an employee's right to take medical leave or to be reinstated following the leave, a violation has occurred regardless of the employer's intent. *Ballato*, 676 F.3d 768. An employer's intent has absolutely no bearing on an employer's liability for FMLA interference. *Id.* As the First Circuit Court of Appeals pointed out in *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998):

> The issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking medical leave. Because the issue is the right to an entitlement,

31

the employee is due the benefit if the statutory requirements
are satisfied, regardless of the intent of the employer.

*Id.*

The District Court allowed Westar to avoid liability for Tonya's FMLA interference claim because Westar "submitted evidence showing it terminated Huber because of its good-faith belief she violated Westar's attendance policy, not because of the absences themselves." (APP.VOL III 757, R. Doc. 66, at 13). First, as set forth above, Westar's reason for terminating Tonya –- that she violated its attendance policy by failing to call in prior to the start of her scheduled shift -- is inextricably linked to the medical emergency which gave rise to Tonya's need for leave, so it cannot be considered wholly unrelated.

Second, consideration of an employer's "good faith belief" as a shield against liability for an FMLA violation is inconsistent with other provisions within the statute. Under 29 U.S.C. § 2617, an employer is liable for liquidated damages *unless* the employer proves their violation was in "good faith" and the employer "had reasonable grounds for believing" that its actions did not violate the FMLA. *Id.* If an employer could avoid liability entirely under the FMLA by citing to its own good faith belief, it would be nonsensical to once again analyze an employer's good faith belief for purposes of assessing liquidated damages. As the Supreme Judicial Court of Massachusetts, Suffolk pointed out in *DaPrato*, "[t]he award of multiple damages, unless the employer demonstrates good faith or lack of knowledge that its conduct violated the FMLA, demonstrates that good faith or honest belief is 'pertinent only to the question of [the

32

amount of] damages under the FMLA, not to liability.'" 482 Mass. 375, 390, (quoting *Bachelder v. America W. Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001)).

### C. The District Court Improperly Granted Westar's Motion for Summary Judgment on Tonya's FMLA Retaliation Claim

While Tonya contends her claim is more properly analyzed as one of FMLA interference, rather than FMLA retaliation or discrimination, sometimes "the lines between the two categories are not hard and fast." *Stallings,* 447 F.3d at 1051; quoting *Dillaway v. Ferrante*, No. Cir. 02-715 (JRT/JSM), 2005 WL 23109696 at *5 (D.Minn. Dec. 9, 2003)(unpublished). Nonetheless, Tonya can just as readily prove Westar's termination of her was based on her exercise of FMLA rights, and is therefore actionable. *See Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002).

The FMLA prohibits employers from discriminating against an employee for asserting their rights under the Act.[2] *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2615 (a)(2)). "To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." *Darby*, 287 F.3d at 679. Termination is an adverse employment action. *Philips*, 547 F.3d 905.

---

[2] *See Pulczinski.*, 691 F.3d at 1006, referring to this type of claim as an FMLA discrimination claim, which arises where "after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment."

Appellate Case: 23-1087    Page: 41    Date Filed: 03/06/2023 Entry ID: 5251865

1. **Westar's reason for terminating Tonya is directly related to exercise of her FMLA rights.**

Tonya engaged in protected activity by taking emergency leave for a serious health condition. She also engaged in protected activity by complying with the applicable FMLA notice requirements to inform Westar of her need for leave. The FMLA's notice requirements form the basis of a substantive right under the FMLA – the right to notify an employer as soon as is practicable under the circumstances when seeking emergency medical treatment, regardless of an employer's contrary policy. *See* 29 C.F.R. § 825.303.

It is Westar's stated position that it fired Tonya for failing to follow its call-in procedure for her absences on December 20 and 21. These absences were protected by the FMLA. As set forth above, it is of no avail that Westar claims it could not have retaliated against Tonya based on her exercise of her FMLA rights, because she did not say the word "FMLA" prior to Westar's termination decision. *See Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 677 (8th Cir. 2000) ("employer who precipitously fires an employee, when the latter claims the benefits of leave under FMLA, bears the risk that the health condition in question later develops into a serious health condition …"). If this Court determines the FMLA's notice requirements are the basis for a substantive right under the FMLA – the right to notify your employer as soon as is practicable under the circumstances when seeking emergency medical treatment, regardless of the employer's policy – then Tonya's claim would be considered a claim for FMLA

34

retaliation. Under this analysis, on December 20 and 21, Tonya not only exercised her right to take emergency leave for her serious health condition, she also exercised her right to prioritize obtaining emergency medical treatment to stabilize her condition, despite her employer's call-in policy, as she was entitled to do under the FMLA. *See* 29 C.F.R. § 825.303(a).

Westar's own reason for terminating Tonya – that she failed to follow Westar's call-in policy to notify it of her protected absences – draws a causal connection between Tonya's protected activity and Westar's reason for terminating her. Westar essentially admits retaliation. Because the requirements of Westar's call-in policy are more onerous than the FMLA's notice requirements for unforeseen, emergency leave, and Tonya complied with applicable FMLA notice requirements, Westar's termination decision necessarily held Tonya's exercise of her rights against her.

Of course, Westar disputes Tonya followed the FMLA notice requirements, and contends Tonya should have been able to contact her supervisor, based on her ability to drive herself to her doctor and have incoherent phone calls with her son and boyfriend. Whether Tonya's condition had stabilized is ultimately a factual dispute, however, which must be resolved by a jury, and was improperly decided on summary judgment.

## 2. Westar's reason for terminating Tonya is pretext for retaliation.

Even if the Court determines Westar's stated reason for firing Tonya does not, standing alone, demonstrate Westar fired Tonya for exercising a protected right, a

35

genuine issue of material fact remains as to whether Westar's reason for terminating Tonya is pretext for discrimination.

Westar's termination decision was made within 30 minutes of Tonya disclosing her need for leave related to treatment of her diabetes. *See Brown v. Diversified Distribution Systems, LLC*, 801 F.3d 901, 910 (8th Cir. 2015) (five days between protected activity and adverse action, viewed in context of overall record may support inference of retaliation). This temporal proximity is particularly relevant in the context of Kelchen's discriminatory attitude, more fully expanded upon in Sections D.1 and D.2, *infra*.

Additionally, Kelchen testified Tonya should have ensured Westar's Elkhorn location was staffed, even while Tonya was on protected leave. (APP.VOL II 342, R. Doc. 42-3, at 35, 140:8-20). Kelchen had similarly noted Tonya left Westar with "[n]o communication to us for her store responsibilities and coverage." (APP.VOL I 93, R. Doc. 39-14, at 2). As set forth more fully in Sections D.1 and D.2, *infra*, Kelchen was intimately involved in Westar's decisionmaking regarding Tonya's termination, so her attitude about Tonya utilizing her leave to rest and recover reflects a discriminatory motivation for its decision.

In addition to the foregoing, it is Westar's position that Kelchen (and by proxy Westermajer) "reasonably believed" Tonya should have been able to contact Westar to report her absences on December 20 and December 21. However, just as Westar's "reasonable belief" is irrelevant to Westar's liability for Tonya's FMLA interference claim, it is irrelevant to Westar's liability for Tonya's FMLA retaliation claim.

36

The provisions of 29 U.S.C. § 2617 regarding an employer's liability for liquidated damages *unless* the employer proves their violation was in "good faith" and the employer "had reasonable grounds for believing" that its actions did not violate the FMLA apply with equal force to FMLA retaliation claims under 29 U.S.C. § 2615(a)(2). *See* 29 U.S.C. § 2617 ("except that if an employer who has violated §2615 of this title proves to the satisfaction of the court that the act or omission which violated § 2615 of this title was in good faith …"). Both interference and retaliation claims arise out of § 2615, which is referenced in the liquidated damages provision in § 2617, so the same principle applies. It is internally incoherent to bar an employer's liability based on its "good faith belief," when the statute itself imposes liquidated damages *unless* an employer can prove it believed, in good faith, it was not violating the FMLA. *See DaPrato v. Massachusetts Water Resources Authority*, 482 Mass. 375, 390-391 (2019) ("It would not make sense to require an employer to prove that its challenged employment decision was done in 'good faith' to avoid mandatory payment of liquidated damages if in fact such a showing would defeat liability entirely.")

Even assuming, *arguendo*, Westar could show it terminated Tonya due to its good faith belief she violated its attendance policy, this would not allow Westar to escape liability for firing Tonya for availing herself of the notice procedures available under the FMLA. If Westar thought its actions in firing Tonya did not violate the FMLA, and its belief was reasonable, this Westar could avoid liquidated damages under 29 U.S.C. § 2617, but this could not provide a full escape from liability for Tonya's termination. *See*

37

*Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (statutory construction must give effect to all provisions, so no part will be inoperative or superfluous).

Based on the facts of the present case, there is also significant doubt as to whether Westar's belief Tonya's alleged policy violation formed an independent basis for Westar's termination of Tonya, regardless of her entitlement to FMLA leave. During their phone call on December 21, 2019, Tonya told Kelchen she was unable to previously contact Westar due to her diabetic emergency and the sedative effect of medications administered by her doctor. Westar had all the information it needed to understand why Tonya could not call, and could have investigated further, consistent with its rights under the FMLA, if it had any doubt as to Tonya's veracity. Instead, Westar fired her. It should be up to a jury to decide whether Westar's belief was reasonable. *See Stallings.*, 447 F.3d at 1052-53 (fact issue precluded summary judgment where employee provided employer sufficient information to know employee was entitled to and did not abuse FMLA leave); *see also Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861 (8th Cir. 2015) (factual disputes precluded summary judgment on FMLA retaliation where employer and employee disagreed on whether employee timely provided adequate notice).

## D. The District Court Improperly Granted Westar's Motion for Summary Judgment on Tonya's Disability Discrimination Claim

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show (1) she is disabled; (2) she was qualified to do the essential job

Appellate Case: 23-1087    Page: 46    Date Filed: 03/06/2023 Entry ID: 5251865

functions with or without reasonable accommodation; and (3) she suffered an adverse action due to her disability. *See Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 921 (8th Cir. 2018).

The District Court assumed without deciding Tonya established her prima facie case of disability discrimination. (APP.VOL III 752-753, R. Doc. 66, at 8-9). The Court dismissed Tonya's disability discrimination claim because it found she was unable to produce direct evidence of discrimination, and could not show Westar's asserted reason for firing her was pretext for discrimination. (APP.VOL III 752-753, R. Doc. 66, at 8-9).

## 1. Tonya presented direct evidence of discrimination.

Direct evidence of discrimination is evidence showing a specific link between alleged discriminatory animus and an employer's decision, sufficient to support a finding by a reasonable jury that discriminatory animus actually motivated the adverse employment action. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Id.* A plaintiff with direct evidence discriminatory animus motivated an employer's adverse action "does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial." *Id.*

Kelchen's behavior during her December 21 phone call with Tonya provides clear evidence of her anger towards Tonya regarding her disability and need for an

39

accommodation. Testimony from an entirely disinterested witness[3] establishes Kelchen was irate during her call with Tonya. Grondin testified, in the call where Tonya explained her diabetic episode and need for time off, Kelchen was "screaming" so loudly that Grondin, who was sleeping in another room, was woken up by the volume of Kelchen's voice. (APP.VOL II 540, R. Doc. 44-4, at 5, 17:9-18:3; 17:7-11). Immediately following this call, Kelchen contacted Westermajer, explained what Tonya told her, and Westermajer decided to fire Tonya. (APP.VOL II 338, R. Doc. 42-3, at 31, 123:8-21); (APP.VOL II 339, R. Doc. 42-3, at 32, 125:3-12; 125:21-25).

In addition to Kelchen's fury during her December 21 call with Tonya, Kelchen's previous refusal to address Tonya's requests for accommodations due to her disability are relevant to show Westar disregarded its obligations to Tonya under the ADA. Even if an employee is not directly stating a claim for failure to accommodate under the ADA, an employer's repeated denials of requests for reasonable accommodations are relevant evidence of an employer's attitude towards the employee's disability. *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833-34 (8th Cir. 2000) (abrogated on other grounds by *Torgerson v. City of Rochester*, 643F.3d 1031, 1043 (8th Cir. 2011). Because accommodation denials reveal an employer's discriminatory intent, "[f]ailing to provide an employee with reasonable accommodations can tend to prove that the employer also

---

[3] Grondin and Tonya ended their relationship in February 2021 and have not spoken to one another since then. (APP.VOL II 545, R. Doc. 44-4, at 10, 39:12-15); (APP.VOL II 549, R. Doc. 44-4, at 14, 57:22-25)

Appellate Case: 23-1087     Page: 48     Date Filed: 03/06/2023 Entry ID: 5251865

acted adversely against the employee because of the individual's disability." *Kells*, 270 F.3d at 834.

Westermajer decided to fire Tonya, but Kelchen's conduct and comments are still relevant to Westar's motivation for its termination decision, because Kelchen was effectively the decisionmaker with regards to Tonya's termination. An employer cannot isolate itself from liability by concentrating all of its decisionmaking authority on one individual. *See Vance v. Ball State Univ.*, 570 U.S. 421, 446-447 (2013) ("If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee.") When an employer concentrates its decisionmaking authority on one individual, "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.*, *see also Staub v. Procter Hosp.*, 562 U.S. 411, 422 (2011) (if supervisor performs act motivated by discriminatory animus intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable).

Westermajer decided to terminate Tonya based on nothing more than a six-minute phone call with Kelchen, less than thirty minutes after Kelchen learned of Tonya's need for accommodations based on her disability. Under the applicable law, though Westermajer may have made the final termination decision, his reliance on

41

Kelchen was effectively a delegation of his authority to her, so her discriminatory attitude is evidence of discriminatory animus in Westar's decision to fire Tonya.

Assuming, *arguendo*, Westermajer's exclusive reliance on Kelchen is insufficient to show she was essentially the decisionmaker, Kelchen's discriminatory animus is still relevant, because she was intimately involved in the decisional process. "Comments which demonstrate a 'discriminatory animus in the decisional process' … *or those uttered by individuals closely involved in employment decisions* may constitute direct evidence …" *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) (emphasis added). The Eighth Circuit has never limited direct evidence to remarks made by the individual who makes the ultimate employment decision. Quite the contrary, the Eighth Circuit has "carefully distinguished between comments which demonstrate discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 640-641 (8th Cir. 2002), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003). "Evidence of discriminatory animus among individuals with influence over decisionmaking can be sufficient for a reasonable jury to conclude discrimination was a motivating factor." *Gruttemeyer v. Transit Authority*, 31 F.4th 638, 648 (8th Cir. 2022).

Kelchen's discriminatory animus – displayed through her anger towards Tonya during their phone call on December 21, and her dismissive attitude regarding Tonya's

42

need for accommodations, is directly relevant to a determination that Westar's decision to terminate Tonya was motivated by discriminatory animus. Where, as is the case here, an supervisor plays a pivotal role in the employment decision, their discriminatory animus must be considered in analyzing whether an employer was motivated by discrimination.

### 2. Westar's purported non-discriminatory reason for termination is pretextual.

Absent direct evidence, proof of pretext, coupled with a strong prima facie case, can create a triable question of fact precluding summary judgment in an employment discrimination case. *Torgerson*, 643 F.3d 1031. The District Court assumed, without deciding, Tonya proved her prima facie case, and ultimately dismissed her disability discrimination claim based on its perception Tonya had not demonstrated pretext. Nonetheless, to demonstrate Tonya's prima facie case is "strong," it is necessary to discuss her evidence of a causal connection between her disability and her termination.

Tonya can show exceptional temporal proximity between the date Kelchen alleges she learned about Tonya's disability and need for accommodations, and Westar's termination decision. *See E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 969-70 (8th Cir. 2014) (temporal connection can demonstrate causal link in ADA prima facie case). "Temporal proximity between the protected conduct and adverse action must be very close for timing alone to be sufficient." *Lors v. Dean*, 746 F.3d 857, 865-66 (8th Cir. 2014) (quotation and citation omitted). The Eighth Circuit has held a "matter of weeks"

43

between an employee's disclosure of a disability and an adverse employment action was sufficient to support an employee's prima facie case. *Sprenger v. Federal Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113 (8th Cir. 2001). Similarly, 13 days between the start of an employee's family leave and her termination has been sufficient to establish causation. *Smith v. Allen Health Sys., Inc.*, 302 F.3d at 833.

Kelchen claims she did not know Tonya had diabetes while Tonya was working at Westar. (APP.VOL II 329, R. Doc. 42-3, at 22, 88:19-21). Kelchen's notes prove she learned during her December 21 call with Tonya that she had diabetes and needed an accommodation of time off for treatment of her diabetes. (APP.VOL I 92, R. Doc. 39-14, at 1) ("her levels of diabetic [sic] was off"). Tonya's 7:45 a.m. call to Kelchen lasted eight minutes. (APP.VOL I 65, R. Doc. 39-6, at 3). According to Westar, Westermajer decided to fire Tonya during Kelchen's call with Westermajer at 8:07 a.m. on December 21, which lasted six minutes. (APP.VOL II 338, R. Doc. 42-3, at 31, 123:8-21); (APP.VOL II 339, R. Doc. 42-3, at 32, 125:3-12; 125:21-25); (APP.VOL I 185, R. Doc. 39-16, at 3). In other words, Westar decided to fire Tonya within *30 minutes* of Tonya's supervisor, Kelchen, being made aware of Tonya's disability and need for accommodation. Westermajer made his decision during the same call where Kelchen disclosed to him Tonya's disability and need for an accommodation.

In addition to presenting a strong prima facie case, Tonya can show additional evidence of pretext. To establish a factual issue on pretext, "the ultimate question is whether the plaintiff presents evidence of conduct or statements by persons involved

44

in the employer's decisionmaking process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in the employer's decision to fire the plaintiff." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (cleaned up).

Even if this Court determines Kelchen's conduct in her December 21 call with Tonya and her repeated denials of Tonya's accommodation requests do not constitute sufficient direct evidence to circumvent the *McDonnell-Douglas* framework, this evidence is still relevant to show pretext. As set forth above, Kelchen was furious during her December 21 call with Tonya, the same call where Tonya informed Kelchen she needed leave, and the first time Kelchen recalls learning about Tonya's diabetes. Additionally, viewing the facts in the light most favorable to Tonya, Kelchen was previously dismissive of Tonya's need to store her insulin at room temperature and take meal breaks. Because Kelchen was intimately involved in the decisional process, her attitude towards Tonya in the December 21 call and her history of disregarding Tonya's accommodation requests reflect a discriminatory motivation. *See Kiel*, *supra*.

Tonya can also demonstrate pretext by showing Westar's "explanation is unworthy of credence … because it has no basis in fact." *Gardner v. Wal-Mart Stores, Inc.*, 2 F 4th 745, 748 (8th Cir. 2021). Evidence an employee did not violate an employer's rules, paired with evidence the employer knew the employee did nothing wrong

Appellate Case: 23-1087     Page: 53     Date Filed: 03/06/2023 Entry ID: 5251865

supports an inference that an adverse action was motivated by discriminatory intent. *Baker v. Silver Oak Senior Living Management, Co., L.C.*, 581 F.3d 684, 689 (8th Cir. 2009).

Though Westar claims Tonya was fired for violating its Attendance and Punctuality policy, Tonya actually followed the process outlined in the policy, which states an employee who is unable to work "must call at least two-hours before [their] work shift begins *when possible*." (APP.VOL I 60, R. Doc. 39-3, at 2) (emphasis added). A fact issue remains regarding whether it was possible for Tonya to call Westar two hours before the start of her shift, as she was incoherent until speaking to Kelchen on December 21. Furthermore, Tonya explained to Kelchen that she was previously unable to call, so Westar knew Tonya called as soon as possible prior to its termination decision. (APP.VOL I 92-93, R. Doc. 39-14, at 1-2).

Once Tonya was able to contact Westar, she followed its policy to the letter. Westar's policy requires an employee to "call and speak directly to the management person in charge. Texting, emailing or leaving a message is not acceptable." (APP.VOL I 60, R. Doc. 39-3, at 2). Pursuant to the policy, Tonya called and spoke directly with Kelchen, her manager.

Additionally, Kelchen suggested in her December 21 call with Tonya that Tonya should have violated Westar's Attendance and Punctuality policy. In contravention of Westar's policy, Kelchen suggested Tonya should have had her son or a nurse from her doctor's office call Westar. (APP.VOL I 92-93, R. Doc. 39-14, at 1-2). In other words, Kelchen did not have a problem with Tonya deviating from Westar's policy in general,

46

but it was a fire-able offense when Tonya was absent due to a medical emergency making it impossible to call two hours prior to the start of her shift.

All of this evidence viewed together in the light most favorable to Tonya is enough to submit the question of whether Westar fired Tonya due to her diabetes and her need for an accommodation – time off for treatment of her diabetes. Thus, Tonya respectfully requests this court reverse the District Court's decision dismissing Tonya's disability discrimination claim and remand the case for trial.

### E. The District Court's Denial of Plaintiff's Motions Should be Reversed

In its Memorandum and Order, the District Court denied Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike ("Plaintiff's Motions"). (APP.VOL III 758, R. Doc. 66, at 14). Though the District Court made a passing reference to "cross motions for summary judgment" and stated "[a]ll three motions are now ripe for review," the District Court did not analyze Plaintiff's Motions in its Memorandum and Order. (APP.VOL III. 749, R. Doc. 66, at 5). Once the District Court Tonya's claims, Plaintiff's Motion for Partial Summary Judgment became moot, because it related only to Defendant's affirmative defenses, and did not have an impact on the District Court's dismissal. Similarly, consideration of Plaintiff's Motion to Strike became unnecessary, because it related only to Defendant's evidence submitted in opposition to Plaintiff's Motion for Partial Summary Judgment. Thus, Plaintiff requests this Court reverse the District Court's denial of Plaintiff's Motions, and remand with instructions for the District Court to consider Plaintiff's Motions on their merits.

47

If this Court determines Plaintiff's Motions should be decided as part of this appeal, Tonya respectfully requests this Court either allow supplemental briefing to address both motions, or rule in her favor on both motions. Tonya submitted ample evidence to demonstrate she mitigated her damages, which "is not onerous and does not require success." *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1065 (8th Cir. 1988). Westar had the burden to show the plaintiff has not fulfilled her mitigation requirement. *See Kehoe v. Anheuser Busch, Inc.*, 96 F.3d 1095 (8th Cir. 1996). Tonya put overwhelming evidence demonstrating she exercised reasonable diligence to find comparable employment, and did not refuse a job substantially equivalent to her job at Westar. *See Parrish v. Immanuel Medical Ctr.*, 92 F.3d 727, 731 (8th Cir. 1996).

The only relevant evidence Westar submitted to support its mitigation defense – the Affidavit of Amy Lyn Rowe and the Affidavit of Cindy Kelchen – must be disregarded pursuant to the self-executing sanctions of Fed. R. Civ. P. 37(c)(1). Both affidavits contain previously undisclosed witness testimony, and even previously undisclosed expert testimony. (APP.VOL III 637-639, R. Doc. 47-2, at 1-3); (APP.VOL III 640-642, R. Doc. 47-3, at 1-3). "Under Rule 37(c)(1), exclusion occurs automatically by operation of the rule." *Vanderberg v. Petco Animal Supplies Stores, Inc.*, 906 F.3d 698, 702 (8th Cir. 2018). Because Westar never disclosed the opinions of Rowe and Kelchen, and because their opinions are the only relevant evidence Westar submitted in support of its mitigation of damages defense, Plaintiff's Motion for Partial Summary Judgment should be granted as to Defendant's mitigation of damages affirmative defense.

48

# IX.  CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests this Court reverse the District Court's decision in Defendant's favor on Defendant's Motion for Summary Judgment, reverse the District Court's dismissal of Plaintiff's claims, and remand the case to proceed to trial.  Additionally, Plaintiff respectfully requests this Court reverse the District Court's denial of Plaintiff's Motions and remand for the District Court to consider Plaintiff's Motions on their merits.  In the alternative, Plaintiff requests this Court either allow supplemental briefing on Plaintiff's Motions, or reverse the District Court's denial of Plaintiff's Motions, and remand with instructions for the District Court to grant both of Plaintiff's motions.

Date: March 3, 2023

> TONYA C. HUBER,
> Plaintiff-Appellant
>
> By:  *s/ Alexis S. Mullaney*
>
> Alexis S. Mullaney, #25908
> Fiedler Law Firm, PLC
> 17330 Wright Street, Suite 102
> Omaha, NE 68130
> (402) 316-3060
> (402) 513-6501 (facsimile)
> alexis@employmentlawnebraska.com
> Attorney for Plaintiff-Appellant

49

## X.    CERTIFICATE THAT BRIEF IS VIRUS FREE

Pursuant to 8th Cir. R. 28A(h)(2), the undersigned counsel certifies this brief and addendum have been scanned for viruses and are virus free.

s/Alexis S. Mullaney
FIEDLER LAW FIRM


## XI.    CERTIFICATE OF COMPLIANCE

Pursuant to FRAP 32(g)(1), I certify the following regarding the foregoing document:

(1) This document complies with the word limit of Fed. R. App. P. 5(c)(1), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 12,957 words.

(2) This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Garamond font, 14 pt. for main body text, 14 pt. for footnote text.

s/Alexis S. Mullaney
FIEDLER LAW FIRM

Appellate Case: 23-1087    Page: 58    Date Filed: 03/06/2023 Entry ID: 5251865

# XII.   CERTIFICATE OF SERVICE

I certify that on March 3, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Bonnie Boryca
boyrca@eslaw.com

s/Alexis S. Mullaney

FIEDLER LAW FIRM

Appellate Case: 23-1087     Page: 59     Date Filed: 03/06/2023 Entry ID: 5251865