# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

## APPEAL NO. 23-1087

## TONYA C. HUBER,
## PLAINTIFF-APPELLANT,

### v.

## WESTAR FOODS, INC.,
## DEFENDANT- APPELLEE.

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

### Brief of Defendant-Appellee Westar Foods, Inc.

Bonnie M. Boryca #24886
Erickson & Sederstrom, P.C.
10330 Regency Parkway Drive
Omaha, NE 68114
(402) 397-2200
(402) 390-7137 Fax
boryca@eslaw.com

Counsel for Defendant-Appellee Westar Foods, Inc.

## SUMMARY OF THE CASE

Tonya C. Huber ("Huber") the Plaintiff in the underlying case and Appellant, brought a Complaint against Westar Foods, Inc. ("Westar") alleging claims of disability discrimination under the Americans with Disabilities Act ("ADA"), and interference and retaliation claims under the Family Medical Leave Act ("FMLA"). Huber appeals the District Court's proper dismissal of her claims in its Order and Memorandum granting Westar's Motion for Summary Judgment.

The District Court properly dismissed Huber's claim of disability discrimination based upon Huber's inability to produce direct evidence of disability discrimination and Huber's failure to establish under the *McDonnell-Douglas* burden-shifting framework that Westar's legitimate non-discriminatory reasons for terminating Huber were pretextual. Additionally, The District Court properly dismissed Huber's FMLA claims because Huber failed to notify Westar as soon as practicable of her need for leave and failed to provide any evidence showing Westar's proffered reason for termination was not the true reason for termination.

Westar respectfully requests this Court affirm the District Court's Order granting Westar's Motion for Summary Judgment and dismissing Huber's claims with prejudice. Westar additionally requests fifteen minutes of oral argument for each Party to address the simple and straightforward issues before the Court.

i

# TABLE OF CONTENTS PAGE

SUMMARY OF THE CASE ................................................................. i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ................................................................. 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE ................................................................. 3

PROCEDURAL HISTORY ................................................................. 9

SUMMARY OF THE ARGUMENT ................................................................. 10

ARGUMENT ................................................................. 12

    I.  Standard of Review for Dismissal of Huber's FMLA and ADA Claim ...... 12

    II. The District Court did not err in dismissing Huber's disability discrimination claim ................................................................. 13

    III. The District Court did not err in dismissing Huber's FMLA interference claim ................................................................. 19

        A. Huber's rights were not violated because the decision was made to terminate Huber prior to her request for FMLA paperwork ................................................................. 19

        B. Huber's FMLA rights were not violated because Huber did not provide Westar with reasonable notice ................................................................. 24

    IV. Standard of Review for Dismissal of Huber's Motion to Strike and Motion for Partial Summary Judgment ................................................................. 30

CONCLUSION ................................................................. 33

CERTIFICATE OF COMPLIANCE ................................................................. 34

CERTIFICATE OF SERVICE ................................................................. 34

Appellate Case: 23-1087    Page: 3    Date Filed: 05/05/2023 Entry ID: 5273594

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)....................................12

*Bacon v. Hennepin County Medical Center*, 550 F.3d 711, 715 (8th Cir. 2008).....26

*Beekman v. Nestle Purina Petcare Co.,* 635 F.Supp.2d 893, 898, 900-01, 913-14 (N.D. Iowa 2009)................................................................................ 2, 25, 26, 27

*Brandt v. City of Cedar Falls*, 37 F.4th 470, 481 (8th Cir. 2022) ..........................18

*Button v. Dakota, Minnesota & E. R.R. Corp.,* 963 F.3d 824, 832 (8th Cir. 2020) .... ..............................................................................................................................14

*Carter v. Atrium Hosp.*, 997 F.3d 803, 808 (8th Cir. 2021) ...................................12

*Chappell v. Bilco Co.*, 675 F.3d 1110, 1115 (8th Cir. 2012)..................................20

*Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)......14

*Corkrean v. Drake Univ.,* 55 F.4th 623, 630 (8th Cir. 2022) .................................12

*Donathan v. Oakley Grain, Inc*., 861 F.3d 735, 740 (8th Cir. 2017).....................15

*E.E.O.C. v. Prod. Fabricators, Inc*., 763 F.3d 963, 969 (8th Cir. 2014) ...........2, 15

*Farver v. McCarthy*, 931 F.3d 808, 811, 931 (8th Cir. 2019) .........................12, 15

*Fiero v. CSG Sys., Inc.,* 759 F.3d 874, 878 (8th Cir. 2014) ..................................17

*Hasenwinkel v. Mosaic,* 809 F.3d 427, 432 (8th Cir. 2015)..............................2, 20

*Heisler v. Nationwide Mut. Ins. Co*., 931 F.3d 786, 794 (8th Cir. 2019)...............15

*Heuton v. Ford Motor Co.,* 930 F.3d 1015, 1022 (8th Cir. 2019) ..........................19

*Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) ............................................15

Appellate Case: 23-1087    Page: 4    Date Filed: 05/05/2023 Entry ID: 5273594

*Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) .......................................12

*Johnson v. Dollar Gen.*, 880 F.Supp.2d 967, 985 (N.D. Iowa 2012), *aff'd*, 508 F.App'x 587 (8th Cir. 2013) ...................................................................20

*King v. Guardian ad Litem Bd.*, 39 F.4th 979, 987 (8th Cir. 2022).......................16

*Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007) .........12

*Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th Cir. 2018).................2, 13

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).............2, 13, 15

*Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) .......................12

*Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016)..............................15

*Phillips v. Mathews*, 547 F.3d 905, 907-10, 912-13 (8th Cir. 2008) .......................... ............................................................................... 2, 16, 24, 26, 27, 29

*Phillips-Foster v. UNUM Life Ins. Co. of America*, 302 F.3d 797 (8th Cir. 2002)...... ...................................................................................................32

*Platte Valley Bank v. Tetra Fin. Grp., LLC*, 682 F.3d 1078, 1086 (8th Cir. 2012) .... ...................................................................................................19

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012)..... ...................................................................................................18

*Quick v. Wal-Mart Stores, Inc.,* 441 F.3d 606, 609 (8th Cir. 2006) .......................14

*Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.,* 444 F.3d 961, 966 (8th Cir. 2006).........................................................................................13

*Sherbert v. Alcan Aluminum Corp.,* 66 F.3d 965, 967 (8th Cir. 1995) ...................32

*Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir. 2002) ..... ...................................................................................................24

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ...................................16

iv

*Thompson v. Univ. of Ark. Bd. of Trs.,* 52 F.4th 1039, 1042 (8th Cir. 2022)..........17

*Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 980 (8th Circuit 2005) ....................................................................................................25

*Torgerson v. City of Rochester,* 643 F.3d 1031, 1045-46 (8th Cir. 2011) .. 14, 16, 17

*U.S. v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003).................................................31

*US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009)............2, 32

*Vinh v. Express Scripts Servs. Co.,* 7 F.4th 720, 727 (8th Cir. 2021)....................17

*Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021) ............................................12

*Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) .........................17

## STATUTES

28 U.S.C. § 1291..........................................................................................1

28 U.S.C. § 1331..........................................................................................1

28 U.S.C. § 1391..........................................................................................1

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(a). ..................................................................................12

Fed. R. Evid. 701 ...................................................................................31, 32

Appellate Case: 23-1087    Page: 6    Date Filed: 05/05/2023 Entry ID: 5273594

# JURISDICTIONAL STATEMENT

On June 17, 2021, Appellant-Plaintiff Tonya C. Huber filed a Complaint in the United States District Court for the District of Nebraska, for its cause of action against Appellee-Defendant Westar Foods, Inc. (App. Vol I, 13; R. Doc. 1 at 5, ¶¶ 21-23). As alleged in Appellant's Complaint, this matter arose under federal and state law. (*Id*.). Pursuant to 28 U.S.C. § 1331, the United States District Court for the District of Nebraska had jurisdiction over Appellant's federal claims. The Court had supplemental jurisdiction over Appellant's state law claims. Further, venue was proper pursuant to 28 U.S.C. § 1391, as the District of Nebraska was the judicial district where the acts alleged were conducted. On January 17, 2023, the District Court granted Westar's Motion for Summary Judgment, denied Appellant's Motion for Partial Summary Judgment and Motion to Strike, entered judgment for Westar and dismissed all of Appellant's claims with prejudice. (App. Vol III, 745-760; R. Doc 66, at 1-14). Appellant filed her timely notice of appeal on the same day (January 17, 2023). This court's jurisdiction is based on 28 U.S.C. § 1291, which provides for jurisdiction over a final judgment from a U.S. District Court.

Appellate Case: 23-1087     Page: 7     Date Filed: 05/05/2023 Entry ID: 5273594

# STATEMENT OF ISSUES

1. Whether the District Court erred in dismissing Huber's disability discrimination claim.

   - *E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963 (8th Cir. 2014).

   - *Lipp v. Cargill Meat Solutions Corporation*, 911 F.3d 537 (8th Cir. 2018).

   - *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

2. Whether the District Court erred in dismissing Huber's FMLA interference claim.

   - *Beekman v. Nestle Purina Petcare Co.*, 635 F.Supp.2d 893 (N.D. Iowa 2009).

   - *Hasenwinkel v. Mosaic*, 809 F.3d 427 (8th Cir. 2015).

   - *Phillips v. Mathews*, 547 F.3d 905 (8th Cir. 2008).

3. Whether the District Court properly denied Plaintiff's Motion to Strike Affidavits and Motion for Partial Summary Judgment.

   - *U.S. v. Espino*, 317 F.3d 788 (8th Cir. 2003).

   - *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687 (8th Cir. 2009).

## STATEMENT OF THE CASE

Tonya Huber is a former employee of Westar. (App. Vol I, 9; R. Doc. 1, at 1, paragraph 2). Westar's business is operating fast food franchises in several Midwest states. (App. Vol I, 12; R. Doc. 1, at 4, paragraph 20). Huber was hired as a Store Manager to work in Westar's Elkhorn Hardee's location. (App. Vol II, 225; R. Doc. 42-2, at 7, 27:15-25). As a part of this role, Huber was responsible for hiring, training, and discipline of crew members, managing the crew, overseeing costs, maintaining the store, and primarily ensuring the store opened on time each day at 5:00 a.m. (App. Vol II, 225; R. Doc. 42-2, at 7, 27:15-25); (App. Vol II, 317; R. Doc. 42-3, at 10, 40:4-20). While working at Hardee's, Huber's supervisors included Matt Thayer, a district manager, and later on Cindy Kelchen, who became the interim district manager for the remainder of Huber's time at Hardee's. (App. Vol II, 314; R. Doc. 42-3, at 7, 28:19-29:9). Upon starting at Westar, Huber received an employee handbook stating if an employee was going to miss work, the employee must call and speak to management; texting or emailing was not sufficient. (App. Vol II, 320; R. Doc. 42-3, at 13, 50:18-51:4); (App. Vol II, 59; R. Doc. 39-3, at 2).

On January 10, 2019, while working at Hardee's, Huber received an employee coaching tool that specifically stated the need for Huber to communicate scheduling changes to management in accordance with company policies. (App. Vol II, 229; R. Doc. 42-2, at 11, 43:6-22). On October 30, 2019, Huber became ill and missed her

scheduled shift and failed to notify her supervisor of the absence. (App. Vol II, 233;

R. Doc. 42-2, at 15, 57:3-58:8); (App. Vol I, 61; R. Doc. 39-4). The following day

on October 31, Huber left the store part-way through her shift on account of her

illness, but failed to call her supervisors and inform them she was leaving. (App.

Vol. II, 233; R. Doc. 42-2, at 15, 58:4-59:20). Huber instead sent a group text to the

managers informing them she was leaving. (App. Vol. II, 232; R. Doc. 42-2, at 14,

53:19-54:8). Following the October 30 and 31 incident, Huber received a formal

write-up for failing to call and report her absences to her supervisors in accordance

with company policies. (App. Vol. II, 232; R. Doc. 42-2, at 14, 53:1-12); (App. Vol.

I, 61; R. Doc. 39-4). In addition to the formal write-up, Kelchen sat down with Huber

and discussed the importance of following the company's policy regarding absences.

(App. Vol. II, 233; R. Doc. 42-2, at 15, 58:9-11); (App. Vol. II, 323; R. Doc. 42-3,

at 16, 64:6-65:5).

Several months after beginning her job at Hardee's, Huber was diagnosed

with diabetes and began taking one insulin shot a day in March 2019. (App. Vol. II,

237; R. Doc. 42-2, at 19, 73:13-74:5). Although Huber's dosage increased

throughout her time at Hardee's, the frequency at which she needed to her insulin

remained at one time per day throughout her time at Hardee's. (App. Vol. II, 237; R.

Doc. 42-2, at 19, 74:8-75:15). Huber alleges there were issues with storage of her

insulin due to temperature in the store and that she brought these issues to the

4

attention of Matt Thayer, her district manager at the time. (App. Vol. II, 237; R. Doc. 42-2, at 19, 76:5-10; at 21, 81:2-11). Huber alleges to have brought the same concern to Kelchen and further alleges that her concerns were disregarded both times. (App. Vol. II, 239; R. Doc. 42-2, at 21, 81:6-11). Huber has never raised this concern with Westar's HR Manager, Amy Rowe. (App. Vol. II, 239; R. Doc. 42-2, at 21, 83:22-84:7). Huber began storing her insulin in a safe at work and nobody had a problem with her continuing to do so. (App. Vol. II, 239; R. Doc. 42-2, at 21, 81:17-84:18).

Huber also allegedly discussed with Kelchen the issue of not having time to eat during her shift. (App. Vol. II, 240; R. Doc. 42-2, at 22, 85:11-23). Huber alleges Kelchen informed Huber to get better at time management as a solution because making time for meal breaks was within a store manager's discretion. (App. Vol. II, 240; R. Doc. 42-2, at 22, 85:17-19); (App. Vol. II, 330; R. Doc. 42-3, at 23, 90:15-25). There is no documentation or evidence that these conversations between Huber and Thayer or Kelchen occurred, nor do Thayer or Kelchen recall these conversations occurring or being aware of Huber's diabetes prior to her termination. (App. Vol. II, 240; R. Doc. 42-2, at 22, 87:2-11); (App. Vol. II, 330; R. Doc. 42-3, at 23, 89:15-91:7); (App. Vol. I, 202; R. Doc. 39-19, at 2, 15:16-16:19).

In mid-December 2019, Huber began to feel sick. (App. Vol. II, 240; R. Doc. 42-2, at 22, 88:1-20). On December 20, 2019, Huber was scheduled to open the Elkhorn Hardee's. (App. Vol. II, 331; R. Doc. 42-3, at 24, 94:15-24). However,

Huber failed to show up for her shift and did not contact her supervisors regarding her absence. (App. Vol. II, 331; R. Doc. 42-3, at 24, 94:18-95:9). Her supervisor, Kelchen, could not reach Huber. It was not until 10:00 a.m., five hours after Huber was to have arrived and opened the store, that Kelchen learned from a customer call to Westar's 800-number that the Elkhorn Hardee's was not open as of that time. (App. Vol. II, 246; R. Doc 42-2, at 28, 110:21-111:10); (App. Vol. I, 63, R. Doc. 39-6); (App. Vol I, 74; R. Doc 39-11, at 2, 7:2-8). On December 21, 2019, management became aware that Huber's absence was due to a diabetic episode. (App. Vol. II, 333; R. Doc. 42-3, at 26, 101:22-23); (App. Vol. II, 247; R. Doc. 42-3, at 29, 114:1-19). Prior to December 20, Huber's diabetes had been well-managed. (App. Vol. II, 240; R. Doc. 42-2, at 22, 86:16-87:1).

On the morning of December 20, Huber was on the phone with her then-boyfriend, Richard Grondin, for around 45 minutes prior to Huber driving herself to the doctor's office. (App. Vol. II, 246; R. Doc. 42-2, at 28, 109:8-23); (App. Vol. I, 63; R. Doc. 39-6, at 3). This call occurred at the time when Huber's shift was set to begin (5:00 a.m.). (App. Vol. II, 232; R. Doc. 42-2, at 14, 54:20-23). Once Huber arrived at the doctor's office, she called her son Trey to inform him where she was. (App. Vol. II, 242; R. Doc. 42-2, at 24, 93:13-95:4). Later that afternoon, Kelchen called Trey in an attempt to figure out where Huber was. (App. Vol. II, 331; R. Doc. 42-3, at 24, 95:3-9) Trey informed Kelchen that he had just spoken with Huber and

6

that Huber's "levels were off." (App. Vol. II, 331; R. Doc. 42-3, at 24, 96:1-23). Trey did not explain further what he was referring to or what specifically was wrong with Huber. (App. Vol. II, 331; R. Doc. 42-3, at 24, 96:24-97:6). Trey then informed Kelchen Huber would call Kelchen soon. (App. Vol. II, 332; R. Doc. 42-3, at 25, 97:7-13).

That same afternoon, Huber called Grondin again and informed him she had low blood sugar and was on an IV, so she would need Grondin to pick her up from the doctor's office. (App. Vol. III, 657; R. Doc. 47-6, at 2, 27:13-20). That evening, Grondin took Huber home where she slept until the morning of the 21st. (App. Vol. III, 657; R. Doc. 47-6, at 2, 28:13-20). Huber had no communication with Kelchen on December 20. (App. Vol. II, 331; R. Doc. 42-3, at 24, 96:1-101:23); (App. Vol. I, 183; r. Doc. 39-16, at 2).

Huber was scheduled to open Hardee's again on the morning of December 21, 2019. (App. Vol. I, 199; R. Doc. 39-18, at 3, 31:2-6). However, Huber again did not show up for her shift and again failed to notify her supervisors that she was not feeling well enough to appear for her shift. (App. Vol. I, 199; R. Doc. 39-18, at 3,31:5-13); (App. Vol. II, 247; R. Doc. 42-2, at 29, 114:14-19). At 7:45 a.m. on the morning of December 21, Kelchen was able to speak to Huber for the first time regarding her absences, nearly three hours after Huber was scheduled to begin her shift. (App. Vol. II, 247; R. Doc. 42-2, at 29, 116:2-8); (App. Vol. II, 333; R. Doc.

42-3, at 26, 101:22-23); (App. Vol. I, 199; R. Doc. 39-18, at 3, 30:20-31:13). During this conversation, Huber told Kelchen that Huber had driven herself to the doctor and back home. (App. Vol. II, 341; R. Doc. 42-3, at 34, 136:23-137:9). Huber provided her supervisors with a doctor's note that referred to the reason for Huber's absence as an "illness," not specifically due to diabetes. (App. Vol. I, 70; R. Doc. 39-9, at 3). Following this conversation, Kelchen informed Westermajer of the past two days events. (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:8-21). Huber knew about the call-in policy when she failed to show up to open the store or report her absence in accordance with policy on two successive days, on December 20 and 21, 2019. (App. Vol. II, 231; R. Doc. 42-2, at 13, 50:18-52:12). Upon Westermajer learning of these events and discussing the situation with Rowe, the decision was made to terminate Huber on December 21. (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:16-124:1); (App. Vol. I, 93; R. Doc. 39-14).

A meeting was scheduled for 3:00 p.m. on December 26, 2019, with Huber to inform her of her termination. (App. Vol. II, 338; R. Doc. 42-3, at 31, 124:7-9); (App. Vol. II, 254; R. Doc. 42-2, at 36, 142:1-144:2); (App. Vol. I, 66; R. Doc. 39-7). However, the meeting did not occur because Huber informed her supervisors that she was not well enough to have a work-related conversation. (App. Vol. I, 68; R. Doc. 39-9, at 1). Effective December 26, 2019, Huber was terminated for failing to follow Hardee's policies of timely calling a supervisor to report a missed shift. (App.

8

Vol. I, 71; R. Doc. 39-10); (App. Vol. II, 257; R. Doc. 42-2, at 39, 155:7-14). Huber received the termination letter drafted by Rowe via email and mail. (App. Vol. II, 257; R. Doc. 42-2, at 39, 155:10-11). This letter also included other instances of Huber's failure to abide by company policy including the employee coaching tool from January 2019 and the formal write-up from October of 2019. (App. Vol. I, 71; R. Doc. 39-10).

The first time Huber requested FMLA paperwork was via email on December 22. (App. Vol. II 254; R. Doc. 42-2, at 36, 144:4-145:3); (App. Vol. I, 67; R. Doc. 39-8). Over the next few days, Huber again requested FMLA paperwork. (App. Vol. I, 68; R. Doc. 39-9). However, the decision to terminate Huber had already been made on December 21 and the termination meeting was scheduled for December 26 at 3:00 p.m. and communicated to Huber before FMLA was ever mentioned. (App. Vol. I, 196; R. Doc. 39-17, at 8, 109:2-19); (App. Vol. II, 254; R. Doc. 42-2, at 36, 143:12-16); (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:16-124:1).

## PROCEDURAL HISTORY

Plaintiff Appellant filed her Complaint June 17, 2021, alleging Defendant Appellee discriminated against her based on her disability in violation of the Americans with Disabilities Act of 1990 as amended in 2008 (ADA) the Nebraska Fair Employment Practices Act (NFEPA), and alleging Defendant to have interfered

with her rights and to have retaliated against her under the Family Medical Leave Act of 1993 (App. Vol. I, 9; R. Doc. 1, at 1, 14:17).

On September 9, 2022, Plaintiff filed a Motion for Partial Summary Judgment as to Defendant Westar's affirmative defenses, Defendant filed its motion for summary judgment as to all of Plaintiff's claims on the same day. (App. Vol I, 33; R. Doc. 38, at 1, App. Vol I, 204; R. Doc. 41, at 1). On October 11, 2022, Plaintiff filed a Motion to Strike affidavits Westar filed in opposition to Plaintiff's Motion for Partial Summary Judgment (App. Vol III, 701-702; R. Doc. 55, at 1-2).

On January 17, 2023, the District Court granted Westar's Motion for Summary Judgment, denied Plaintiff's Motion for Partial Summary Judgment and Motion to Strike, entered judgment for Westar and dismissed all of Plaintiff's claims with prejudice. (App. Vol III, 745-760; R. Doc 66, at 1-14). Plaintiff filed her notice of appeal the same day. *Id.*

## SUMMARY OF THE ARGUMENT

Westar's Motion for Summary Judgment on Huber's claims of interference and retaliation under the FMLA and discrimination under the ADA was properly granted by the District Court.

Westar did not discriminate against Huber based on her diabetes. There is no evidence to demonstrate a genuine issue of material fact regarding the justification for Westar's decision to terminate Huber for her continual violations of policy.

10

Westar was unaware of Huber's diabetes until after her termination. Huber provides no evidence she was treated less-favorably than non-diabetic employees. Further, Westar provided evidence that Huber repeatedly refused to follow the policy outlined in the employee handbook and was terminated for that reason.

Westar did not violate Huber's rights under the FMLA because Huber was not entitled to FMLA benefits as she was necessarily and lawfully terminated for reasons wholly unrelated to her subsequent after-the-fact request for FMLA paperwork. Huber failed to provide Westar with reasonable notice as soon as practicable and her supervisors had no reason to know of Huber's claimed need for leave until *after* the decision to terminate Huber had been made. Westar did not retaliate against Huber for requesting FMLA leave as the decision to terminate Huber was made prior to her request for FMLA leave and her prior unrelated medical leave requests were granted with no issues.

The District Court properly dismissed Huber's Motion to Strike and Motion for Summary Judgment. The District Court's dismissal of Huber's Motion to Strike and Motion for Summary Judgment as related to Rowe and Kelchen's affidavits was proper because they satisfy the foundation requirements for lay opinion testimony, based on their industry experience and are entirely void of any expert testimony.

Appellate Case: 23-1087    Page: 17    Date Filed: 05/05/2023 Entry ID: 5273594

# ARGUMENT

## I.  Standard of review for District Court's grant of summary judgment in favor of Westar on Huber's claims.

The Eighth Circuit reviews a district court's grant of summary judgment de novo and views the evidence and draws all reasonable inferences in the light most favorable to the nonmovant. *Corkrean v. Drake Univ.,* 55 F.4th 623, 630 (8th Cir. 2022) (quoting *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007)). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather the dispute must be outcome determinative under prevailing law." *Corkrean*, 55 F.4th at 630 (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). A genuine dispute only exists if "there is enough evidence that a reasonable jury could return a verdict for the nonmoving party." *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When determining summary judgment, the Court "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)). To defeat summary

12

judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Carter v. Atrium Hosp.*, 997 F.3d 803, 808 (8th Cir. 2021).

## II. The District Court did not err in dismissing Huber's disability discrimination claim.

The District Court properly dismissed Huber's discrimination claim because she cannot prove she was discriminated against because of her diabetes through either of two available methods: "direct evidence of disability discrimination" or through indirect evidence by "apply[ing] the burden-shifting framework" from *McDonnell Douglas Corp. v. mo*, 411 U.S. 792, 802-03 (1973); *Lipp v. Cargill Meat Sols. Corp*., 911 F.3d 537, 544 (8th Cir. 2018). "Direct evidence includes 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Id.* at 543 (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.,* 444 F.3d 961, 966 (8th Cir. 2006)).

The District Court properly decided there was no direct evidence of discrimination. Huber previously argued and alleged she made requests for accommodation which were denied by Westar, however, no facts on the record support that. (App. Vol. II, 239; R. Doc. 42-2, at 21, 81:4-86:8). Further, Plaintiff's attempts to characterize Westar and its employees as contemptuous or angry do not

show direct evidence of discrimination. Even if the "conversations did occur" as Huber stated, they do not provide a strong causal link between the "discriminatory bias" and Huber's termination. Notably, Westar points out that Kelchen and Thayer were "not decision makers" whose statements could ever be direct evidence of discrimination. (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:14-124:1). "Direct evidence of employment discrimination must be distinguished from stray remarks in the workplace, statements by nondecision makers, or statements by decisionmakers unrelated to the decisional process." *Quick v. Wal-Mart Stores, Inc.,* 441 F.3d 606, 609 (8th Cir. 2006) (citing *Clearwater v. Indep. Sch. Dist. No. 166*, 231 F.3d 1122, 1126 (8th Cir. 2000)). Huber has alleged the conversations with Kelchen and Thayer to be direct evidence. Alas, neither Kelchen nor Thayer were decisionmakers, and neither made the ultimate decision to terminate Huber, Westermajer did. (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:16-124:1).

Even if the alleged statements from Kelchen and Thayer about Huber's insulin and lunch breaks were considered more than stray remarks, the alleged statements would have occurred months before she was terminated. (App. Vol II, 239; R. Doc. 42-2, at 21, 81:25-82:12). Based on the length of time between when these alleged statements were made and Huber's termination, there is insufficient direct evidence to "show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias

14

motivated the action." *Button v. Dakota, Minnesota & E. R.R. Corp.,* 963 F.3d 824, 832 (8th Cir. 2020) (quoting *Torgerson v. City of Rochester,* 643 F.3d 1031, 1045-46 (8th Cir. 2011) (en banc)). Thus, Huber presented no direct evidence of disability discrimination, as the District Court correctly determined.

Since Huber failed to present any direct evidence, the District Court then considered Huber's discrimination claim under the *McDonnell-Douglas* burden-shifting framework. Under *McDonnell-Douglas*, a prima facie case of discrimination requires proof that the complainant: "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [her] disability." *E.E.O.C. v. Prod. Fabricators, Inc*., 763 F.3d 963, 969 (8th Cir. 2014) (quoting *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)).

Under this framework, even if Huber would have been able to establish a prima facie case of disability discrimination and shift the burden to Westar, Westar had a legitimate, nondiscriminatory reason for the adverse action. *Oehmke v. Medtronic, Inc*., 844 F.3d 748, 755 (8th Cir. 2016); see also *Donathan v. Oakley Grain, Inc*., 861 F.3d 735, 740 (8th Cir. 2017). Since Westar produced evidence of its legitimate, nondiscriminatory reason for Huber's termination, "the burden of production shifts back to [Huber] to show the proffered reason was mere pretext for intentional discrimination." *Farver*, 931 F.3d at 812. Huber "at all times bears the

15

'ultimate burden of persuasion.'" *Heisler v. Nationwide Mut. Ins. Co*., 931 F.3d 786, 794 (8th Cir. 2019) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

The District Court did not err in its decision because Westar demonstrated a legitimate, non-discriminatory reason for terminating Huber, who failed to meet her "ultimate burden" of producing evidence showing Westar's "justifications are mere pretext." *Torgerson,* 643 F.3d at 1046. "[P]roving pretext ... 'requires more substantial evidence than it takes to make a prima facie case' and 'evidence of pretext and discrimination is viewed in light of [Westar's] justification.'" *King v. Guardian ad Litem Bd*., 39 F.4th 979, 987 (8th Cir. 2022) (quoting *Phillips v. Mathews*, 547 F.3d 905, 912-13 (8th Cir. 2008)).

Huber does not dispute she was previously disciplined for violating Westar's attendance policy. Huber received a formal write-up prior to the December 2019 incident for failing to abide by Westar's call-in policy. (App. Vol I, 61; R. Doc. 39-4). In addition, Huber cannot deny that she failed to call Kelchen at all on December 20, 2019, when she missed work because of her medical issues. (App. Vol II, 246; R. Doc. 42-2, at 28, 112:12-16); (App. Vol I, 65; R. Doc. 39-6, at 3). Nor does she contest that the day of the medical issues, she drove herself to the clinic, spoke to Grondin over the phone several times, and also was able to speak with her son over the phone. (App. Vol. II, 242; R. Doc. 42-2, at 24, 93:16-12) (App. Vol. II, 277; R.

16

Doc. 42-2, at 59, 236:10-18); (App. Vol. II, 341; R. Doc. 42-3, at 34, 136:23-137:9).

Lastly, Huber cannot dispute that Westar's decision to terminate her was based on

Kelchen's knowledge that Huber drove herself to the clinic on December 20, and

called her son on December 20. (App. Vol. I, 196; R. Doc. 39-17, at 8, 110:3-8);

(App. Vol. I, 71; R. Doc. 39-10, at 1). The recurring violations of Westar's policy

referenced here and in the termination letter distributed to Huber show a legitimate,

non-discriminatory reason for Huber's termination.

Further, the District Court did not err in its decision because Huber is unable

to demonstrate a material question of fact regarding pretext. In order to do so, Huber

needs to show that Westar's "explanation is unworthy of credence ... because it has

no basis in fact," or "persuad[e] the court that a prohibited reason more likely

motivated" Westar. *Id.* (quoting *Torgerson*, 643 F.3d at 1047). Huber cannot "point

to enough admissible evidence to raise genuine doubt as to the legitimacy of

[Westar's] motive." *Thompson v. Univ. of Ark. Bd. of Trs.,* 52 F.4th 1039, 1042 (8th

Cir. 2022) (quoting *Fiero v. CSG Sys., Inc.,* 759 F.3d 874, 878 (8th Cir. 2014)).

Huber must "do more than simply create a factual dispute as to the issue of pretext;

[she] must offer sufficient evidence for a reasonable trier of fact to infer

discrimination." *Vinh v. Express Scripts Servs. Co.,* 7 F.4th 720, 727 (8th Cir. 2021)

(quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)).

Appellate Case: 23-1087     Page: 23     Date Filed: 05/05/2023 Entry ID: 5273594

Huber asserts the evidence shows she "followed Westar's policy" and she never actually violated Westar's attendance policies in October 2019, when she received a write-up, or on December 20 and 21. (App. Vol. III, 753; R. Doc. 66, at 9). The District Court was not convinced this alleged compliance coupled with Westar's "history of acting with contempt" toward her diabetes, would be enough such that a reasonable juror could find Westar's explanation was pretextual. (App. Vol. III, 758; R. Doc. 66, at 14). Huber cannot and did not put forth sufficient evidence that she did not violate the attendance policy on either occasion. Even if she had, the evidence would still be insufficient to overcome summary judgment, as Huber "must present sufficient evidence that [Westar] acted with an intent to discriminate, not merely that the reason stated by [Westar] was incorrect." *Pulczinski v. Trinity Structural Towers, Inc*., 691 F.3d 996, 1003 (8th Cir. 2012). Huber is unable to show that Westar "did not truly believe [she] violated company rules." *Id*. Huber cannot produce any evidence disputing Westar's good-faith belief that she violated the attendance policy in October and December of 2019.

The District Court did not err in its decision because Westar provided a legitimate non-discriminatory reason for termination and Huber has failed to offer sufficient evidence that her termination was pretextual. Huber offered no evidence indicating Westermajer, who made the decision to terminate her, had discriminatory animus. Misplaced allegations of Westar's "contempt" toward Huber's disability is

18

largely "speculation and [Huber's] own suppositions." *Brandt v. City of Cedar Falls*, 37 F.4th 470, 481 (8th Cir. 2022). Further, there is no genuine dispute that Westar had an honest, good-faith belief Huber that violated the attendance policy when she was terminated. Therefore, the District Court did not err in dismissing Huber's discrimination claim.

### III. The District Court did not err in dismissing Huber's FMLA interference claim.

Summary judgment was properly entered in favor of Westar on the claim that Huber was denied FMLA due to her termination. Dismissal of Huber's FMLA claim was proper because Westar complied with its duties under FMLA and did not violate Huber's FMLA rights. Additionally, Huber improperly attempts to apply a "good faith" standard to her FMLA claims in error. In addition to misunderstanding the law by this argument, Huber wrongly attempts to raise an issue on appeal not raised at the District Court level, and subsequently waived this argument because it was not raised below. *Heuton v. Ford Motor Co.,* 930 F.3d 1015, 1022 (8th Cir. 2019); *See Platte Valley Bank v. Tetra Fin. Grp., LLC*, 682 F.3d 1078, 1086 (8th Cir. 2012).

### A. Huber's rights were not violated because the decision was made to terminate Huber prior to her request for FMLA paperwork.

Huber's FMLA interference claim was properly dismissed because Huber was not entitled to FMLA. The decision to terminate Huber was made on December 21,

2019, and Huber did not request FMLA paperwork until the evening of December 22, 2019.

When a plaintiff claims that an employer interfered with her FMLA rights by denying the plaintiff's request, the plaintiff must show that she was eligible for FMLA leave, that the employer was on notice of her need for FMLA leave, and that the company denied her benefits to which she was entitled. *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015). Termination is actionable under FMLA only if the employee was discharged because of her FMLA leave. *Hasenwinkel*, 809 F.3d 427, 433. An employee who requests FMLA leave has no greater protection against termination for reasons unrelated to the FMLA leave than she did before taking the leave. *Johnson v. Dollar Gen.*, 880 F.Supp.2d 967, 985 (N.D. Iowa 2012), *aff'd*, 508 F.App'x 587 (8th Cir. 2013). A company may take action against an employee for violating the company call-in policy even when the employee is on FMLA leave. *Johnson*, 880 F.Supp.2d 967, 985 (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1115 (8th Cir. 2012)).

Huber's rights under FMLA were not interfered with because Huber did not ever become entitled to FMLA benefits. Huber was terminated for reasons wholly unrelated to her after-the-fact request for FMLA "paperwork," at a time when she acknowledges she was aware that the meeting to effectuate her termination had already been scheduled a day earlier on December 21, 2019. (App. Vol. II, 254; R.

20

Doc. 42-2, at 36, 143:12-16); (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:14-124:9). Westar relied on Huber, as the general manager of the Elkhorn store, to be there to open the store early each morning in order for the business to properly open on time. (App. Vol. II, 317; R. Doc. 42-3, at 10, 40:4-20). Huber knowingly violated the call-in policy when she failed to show up to open the store or report her absence in accordance with policy on two successive days, on December 20 and 21, 2019 when she was clearly able to have done so. (App. Vol. II, 231; R. Doc. 42-2, at 13, 50:18-52:12). It was inexcusable that, on December 20, 2019, Kelchen could not reach Huber. It was not until 10:00 a.m., five hours after Huber was to have arrived and opened the store, that Kelchen learned from a customer call to Westar's 800-number that the Elkhorn Hardee's was not open as of that time. (App. Vol. II, 246; R. Doc 42-2, at 28, 110:21-111:10); (App. Vol. I, 63, R. Doc. 39-6); (App. Vol I, 74; R. Doc 39-11, at 2, 7:2-8).

It is undisputed that Huber was aware of the Employee Handbook and the specific policies requiring that if she was going to miss work, she must call and speak to management to report her absence, and that texting or emailing was not acceptable. (App. Vol. II, 231; R. Doc. 42-2, at 13, 50:18-51:4); (App. Vol. I, 59; R. Doc. 39-3); (App. Vol. II, 308; R. Doc. 42-3, at 36, 141:20-142:19); (App. Vol. I, 94; R. Doc. 39-15, at 40). Indeed, Huber had previously gotten into trouble for violating this policy and had been issued formal warnings or disciplinary action

21

stating that she would be required to follow the policy in the future, first in January 2019 (App. Vol. II, 229; R. Doc. 42-2, at 11, 43:6-22); (App. Vol. I, 61; R. Doc. 39-4) and again, on October 30, 2019, shortly before her further violation of the policy in December 2019. (App. Vol. II, 231; R. Doc. 42-2 at 13, 50:18-51:4; 53:1-54:6; 67:18-68:5; 69:1-6); (App. Vol. I, 59; R. Doc. 39-13); (App. Vol. I, 61; R. Doc 39-4); (App. Vol. I, 62; R. Doc. 39-5); (App. Vol. II, 323; R. Doc 42-3, at 16, 64:6-65:5; 66:3-6); (App. Vol. I, 91; R. Doc. 39-13). Following the second write-up and disciplinary action, Kelchen held a meeting with Huber to once again discuss the importance and necessity of following the company's policy requiring employees in Huber's position to call their supervisor in the event they could not be at work on a particular day. (App. Vol. II, 323; R. Doc. 42-3, at 16, 64:6-65:5); (App. Vol. II, 233; R. Doc 42-2, at 15, 58:9-11).

After receiving multiple warnings, and having the aforementioned meeting with Kelchen, Huber failed to show up to open the Elkhorn store and failed to contact her supervisor, Kelchen, on two successive days shortly thereafter, specifically December 20, 2019, and December 21, 2019. (App. Vol. II, 331; R. Doc 42-3, at 24, 94:15-24, 96:1-12; at 25 97:7-13; 99:24-101:23); (App. Vol. I, 183; R. Doc 39-16); (App. Vol. I, 199; R. Doc. 39-18, at 3; 31:5-13); (App. Vol. II, 247; R. Doc. 42-2, at 29, 114:14-19). Based on these events, Kelchen contacted Westermajer, owner and President of the company, and after discussing and reviewing the situation,

Westermajer immediately decided on December 21 to terminate Huber. (App. Vol. II, 338; R. Doc. 42-3, at 31, 123:16-124:1); (App. Vol. I, 92; R. Doc. 39-14). The decision to terminate was then relayed to Rowe, who drafted the termination letter. (App. Vol. II, 338; R. Doc. 42-3, at 31, 124:2-6; at 32, 125:24-25); (App. Vol. I, 195; R. Doc. 39-17, at 7, 89:16-18).

There is no evidence to support the notion that Huber ever informed her supervisors of her need for leave or that they had any reason to know of the need for leave, until after the decision to terminate Huber had been made and essentially effectuated. It was not until the night of December 22, after the termination decision, that Huber first asked for FMLA paperwork. (App. Vol. I, 92; R. Doc. 39-14).

Moreover, it is undisputed, including through the deposition testimony of Huber, that the meeting scheduled with Huber for 3:00 p.m. on December 26, 2019, was scheduled, and Huber confirmed it on December 21, 2019, before any suggestion of a need for FMLA leave or request for FMLA paperwork was raised by Huber. (App. Vol. II, 338; R. Doc. 42-3, at 31, 124:7-9); (App. Vol. II, 254; R. Doc. 42-2, at 36, 142:1-19; 143:12-16); (App. Vol. I, 66; R. Doc. 39-7); (App. Vol. I, 68; R. Doc. 39-9). Huber knew the meeting was not to report for a shift and she acknowledged the meeting under oath and had to know what the purpose of the meeting was, as of December 21, before she ever raised any issue concerning FMLA

23

or a request for "paperwork". (App. Vol. II, 254; R. Doc. 42-2, at 36, 143:12-16); (App. Vol. I, 196; R. Doc. 39-17, at 8, 109:2-19).

Huber is entitled to no protection against termination for reasons unrelated to FMLA and based on the timeline of events and Huber's previous violations of company policy, Westar's termination of Huber was valid and did not violate Huber's FMLA rights. The District Court's ruling to this effect should be upheld.

### B. Huber's FMLA rights were not violated because Huber did not provide Westar with reasonable notice.

For FMLA to apply, notice is required as soon as practical for an unforeseeable event. 29 C.F.R. § 825.302(a). The employer's duties arise when the employee provides enough information to put the employer on notice that the employee may need FMLA leave. *Id.* The notice requirement may be satisfied if the employer has reason to know that a doctor's appointment or time off of work is related to a serious health condition. *Id.* However, this does not mean that every routine visit to a doctor constitutes notice to an employer of a potential serious health condition. *Phillips v. Mathews,* 547 F.3d 905 (8th Cir. 2008). A statement that an employee will be absent because of their illness "again," is considered a valid request for FMLA leave when the employer knew that the illness had been an issue in the past and had come up again. *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir. 2002).

24

Employees subject to FMLA should be disciplined for violation of the company's call-in procedures in a way similar to employees not on FMLA leave. *Beekman v. Nestle Purina Petcare Co.,* 635 F.Supp.2d 893, 913-914 (N.D. Iowa 2009). See also: *Throneberry v. McGehee Desha County Hosp.,* 403 F.3d 972, 980 (8th Circuit 2005) (even if an employee is actually on approved FMLA leave, the employee may be disciplined in the same manner as if he or she is not on FMLA, finding that an employee on FMLA has no greater rights regarding their conduct in compliance with policies potentially leading to termination than employees not on FMLA).

In *Beekman v. Nestle Purina Petcare Co.*, plaintiff-Beekman was terminated for violating Nestle's attendance policy. 635 F.Supp.2d 893, 913-14 (N.D. Iowa 2009). At the time of the termination, Beekman had received several warnings about her attendance. *Beekman*, 635 F.Supp.2d at 901. Nestle used a point system and would terminate employees if they receive too many points for attendance related issues. *Id* at 898. On November 15, 2005, Beekman received another "point" for an improper call-in after being absent from work that day due to a work-related back injury and was ultimately terminated for her various attendance violations. *Id* at 900. Nestle attempted to claim that Beekman did not inform the correct person of her leave and that Nestle had no way of knowing her absence was related to a claim for FMLA. *Id* at 913. However, there was evidence to show that Beekman did provide

25

notice to an individual she had notified previously of absences, and this allowed for the possibility of a reasonable jury finding that Beekman's FMLA rights were interfered with by attaching a negative consequence to Beekman's protected rights. *Id* at 914. The *Beekman* court compared the case to *Bacon v. Hennepin County Medical Center*, which held there was no interference when an employee was terminated based on her failure to comply with the employer's call-in policy while taking FMLA leave because there was no evidence that the employee called in or that the employers were requiring a more strict compliance than typically used. *Beekman*, 635 F.Supp.2d at 914 (citing *Bacon v. Hennepin County Medical Center* 550 F.3d 711, 715 (8th Cir. 2008)).

In *Phillips*, plaintiff-Phillips was involved in a car accident on her way to work. *Phillips*, 547 F.3d at 907. Phillips went to the emergency room where she denied a doctor's excuse to take time off of work and performed her normal job responsibilities for the rest of the week without issue. *Id.* at 908. Phillips scheduled a subsequent doctor's appointment and discussed it with her supervisor, during which conversation her supervisor mentioned Phillip's potential need to take additional time off and gave Phillips FMLA paperwork to complete. *Id.* at 908. Phillips did not complete the paperwork or talk to the individuals responsible for handling FMLA issues. *Id.* Prior to her doctor's appointment, Phillips had been scheduled to work, but the morning of her appointment, her car would not start, and

26

she failed to show up for work. *Id.* At her appointment, Phillips had the doctor complete the necessary FMLA paperwork, but was unable to submit it to her employer because upon arrival at work, Phillips was given a letter of termination for failing to report to work. *Id.*

Following her termination, Phillips claimed FMLA interference and retaliation, and her employer argued they lacked notice concerning Phillip's need for FMLA leave. *Id* at 909. The lower court granted summary judgment in favor of the employer, but the court of appeals reversed, finding Phillips satisfied the notice requirement by putting the employer on notice that the doctor's visit she missed work for was related to her prior accident and could potentially result in additional time off. *Id* at 910. Phillips and her supervisor had specifically discussed the possibility of FMLA leave and the parties awareness of a possible need for such leave constituted notice under the FMLA requirement. *Id* at 910.

Unlike the facts supporting *Beekman*, Westar was not provided with notice of Huber's condition as soon as practicable for the unforeseeable events on December 20 and 21, 2019. On the morning of December 20 before her shift began, Huber called her boyfriend, Grondin, and spoke with him for 45 minutes. (App. Vol. II, 246; R. Doc. 42-2, at 28, 109:8-23); (App. Vol. I, 63; R. Doc. 39-6, at 3). He does not specifically remember this phone call or a call where anything was out of the ordinary. (App. Vol. II, 542; R. Doc. 44-4, at 7, 25:16-27:8). The call was made

27

during the time Huber's shift was set to begin. (App. Vol. II, 232; R. Doc. 42-2, at 14, 54:20-21). Thus, there is no reason why Huber could not have called Kelchen at this same time— yet she failed to do so.

After the first phone call with Grondin, Huber drove herself to the clinic where she proceeded to call Grondin several more times. (App. Vol. II, 232; R. Doc. 42-2 at 14, 54:20-23; at 28, 109:8-23); (App. Vol. I, 63; R. Doc. 39-6, at 3); (App. Vol. I, 198, R. Doc. 39-18, at 2; 27:13-20). While at the clinic, Kelchen was able to talk on the phone with Huber's son, Trey, who informed Kelchen that Huber's "levels were low" and that Huber would be in contact with Kelchen later to explain. (App. Vol. II, 331; R. Doc. 42-3, at 24, 96:1-16); (App. Vol. I, 75; R. Doc. 39-11, at 3, 9:15-10:5). Huber called Grondin that afternoon to request a ride home from the clinic. (App. Vol. II, 542; R. Doc. 44-4 at 7, 27:13-20). Once home, Huber fell asleep and did not wake up until the next morning after her December 21 shift was set to start. (App. Vol. II, 542; R. Doc. 44-4, at 7, 28:13-20); (App. Vol. II, 247; R. Doc. 42-2, at 29, 114:14-19). The morning of December 21, Kelchen finally got a hold of Huber who explained what had occurred, but by this time it was well after the time Huber was scheduled to open the store and work that day. (App. Vol. I, 198; R. Doc. 39-18, at 2, 28:13-20); (App. Vol. I, 199; R. Doc. 39-18, at 3, 3:20-31:13); (App. Vol. II, 333; R. Doc. 42-3, at 26, 101:22-23); (App. Vol. II, 247; R. Doc. 42-2, at 29, 116:2-8).

Appellate Case: 23-1087   Page: 34   Date Filed: 05/05/2023 Entry ID: 5273594

On December 20, 2019, Huber was capable of calling her boyfriend and having a 45-minute conversation and was then also able to drive herself to the clinic, yet failed to contact Westar to give notice that she was not opening its restaurant. (App. Vol. II, 246; R. Doc. 42-2, at 28, 109:8-23); (App. Vol. I, 63; R. Doc. 39-6, at 3). This points to the fact that as a practical matter, Huber would have been capable of calling into Westar on the morning of December 20 to provide it with notice of the unforeseeable event. Further, as the day went on and Huber was able to talk to her son and call Grondin for rides, she would have been able to inform Westar (via Kelchen) that she was still unwell and at the doctor, which, if it had been done, would have put Westar on notice.

The notice requirement was not satisfied by the exception outlined in *Phillips*, as Westar had no reason to know that Huber's time off work on December 20 and 21 was related to a serious health condition. Huber had never previously communicated to her supervisors that she missed work on account of her diabetes, and her supervisors claim they have never been aware of her condition. (App. Vol. II, 240; R. Doc. 42-2, at 22, 87:2-11); (App. Vol. II, 330; R. Doc. 42-3, at 23, 89:15-91:7; (App. Vol. I, 202; R. Doc. 39-19, at 2, 15:16-19). Rowe, who handled HR and accommodations on requests, was also unaware. (App. Vol. II, 386; R. Doc. 42-5, at 17, 65:10-21). Further, the medical note provided to Westar only stated "illness" as Huber's reason for missing work on December 20; no specifics about her condition,

Appellate Case: 23-1087     Page: 35     Date Filed: 05/05/2023 Entry ID: 5273594

or what caused it, were provided. (App. Vol. I, 68; R. Doc. 39-9). Therefore, Westar was not provided with reasonable notice under FMLA because Huber did not provide notice as soon as practicably possible and Westar had no reason to know her absence was due to an FMLA-covered condition.

Huber's claims allege her termination was a violation of Nebraska and federal law alleging she was terminated due to her diabetes. However, Huber can point to no evidence which demonstrates a genuine issue of material fact regarding Westar's decision to terminate Huber for her continual violations of policy. Further, Westar provided evidence of its legitimate reasons for terminating Huber that were completely unrelated to her disability. Therefore, the District Court's finding should be upheld.

### IV. Plaintiff's partial motion for summary judgment and plaintiff's motion to strike were properly denied by the District Court.

The District Court properly denied Plaintiff's Motion to Strike Affidavits from Defendant witnesses Amy Rowe and Cindy Kelchen because these affidavits satisfy the foundation requirements for lay opinion testimony and are very clearly not based on expert testimony. The District Court properly denied Plaintiff's Partial Motion for Summary Judgment because it had no reason to rule on affirmative defenses when all of Huber's claims were dismissed by granting Westar's Motion for Summary Judgment.

30

Had the District Court considered Huber's Motion to Strike the Rowe and Kelchen affidavits, it would have denied the motion. These affidavits are based on the witnesses' firsthand industry experience regarding fast-food staffing shortages they personally observed in their respective lines of work. (App. Vol. III, 637; R. Doc. 47-2); (App. Vol. III, 640; R. Doc. 47-3). This is not expert knowledge under Fed. R. Evid. 702.

The District Court's Memorandum and Order did not need to consider at any length Huber's Motion to Strike Kelchen and Rowe as expert witnesses, because they very clearly are not providing expert testimony nor being portrayed as experts. The content of the affidavits is not scientific or specialized. Rowe and Kelchen's affidavits satisfy the foundation requirements for lay opinion testimony. Lay witnesses may testify about facts within their "range of generalized knowledge, experience, and perception." *U.S. v. Espino*, 317 F.3d 788, 797 (8th Cir. 2003). Under Fed. R. Evid. 701:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *Id.*

In other words, a lay witness's testimony in the form of opinions or inferences need only be rationally based on perception and helpful to a determination of a fact

31

in issue. *US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 690 (8th Cir. 2009). Expert testimony, however, is not required when "the ability to make inferences and draw conclusions is within the common knowledge of a lay person." *Phillips-Foster v. UNUM Life Ins. Co. of America*, 302 F.3d 785, 797 (citing *Sherbert v. Alcan Aluminum Corp.,* 66 F.3d 965, 967 (8th Cir. 1995)).

The District Court properly dismissed Huber's Partial Motion for Summary Judgement because the court need not rule on matters not pertaining to its final judgment and disposition of the case. Here, the ruling on Defendant's Motion for Summary Judgment resolved all aspects of the case and there was no need to consider either of Plaintiff's motions.

Therefore, the District Court correctly denied Plaintiff's Motion to Strike. The testimony of Rowe and Kelchen was based on their first-hand industry experience, satisfying the requirements of a lay opinion under Fed. R. Evid. 701. Further, there was no reason for the court to address Plaintiff's motions as all issues were resolved upon the granting of Westar's Motion for Summary Judgment. Therefore, the District Court properly denied Plaintiff's Motion to Strike Affidavits of Rowe and Kelchen and properly denied Plaintiff's Partial Motion for Summary Judgment.

32

## CONCLUSION

For the foregoing reasons, Westar respectfully requests this Court affirm the District Court's decision in Westar's favor on its Motion for Summary Judgment and affirm the dismissal of Plaintiff's claims. In addition, Westar respectfully requests this court affirm the District Court's denial of the Plaintiff's Motions, as well.

Date: May 5, 2023

WESTAR FOODS, INC.,
Defendant-Appellee

By: */s/ Bonnie M. Boryca*

Bonnie M. Boryca #24886
Erickson & Sederstrom, P.C.
10330 Regency Parkway Drive
Omaha, NE 68114
(402) 397-2200
(402) 390-7137 Fax
boryca@eslaw.com
Counsel for Defendant-Appellee

33

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 28(a)(10) and Fed. R. App. P. 32(a)(7) & (g)(1), the undersigned counsel hereby certifies that this brief complies with the word/line limits set forth in Fed. R. App. P. 37(a)(7). The brief contains 8,226 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word using 14-point Times New Roman font.

The electronic version of this brief complies with 8th Cir. R. 28A(h)(2) because this brief has been scanned for viruses and the brief is virus-free.

By: /s/ *Bonnie M. Boryca*
Bonnie M. Boryca #24886
Erickson & Sederstrom, P.C.
Counsel for Defendant-Appellee Westar Foods, Inc.

## CERTIFICATE OF SERVICE

The undersigned certifies the foregoing Defendant – Appellee's brief to have been filed electronically and served upon all Parties counsel of record as entered in the CM/ECF system on May 5, 2023 as follows:

Alexis S. Mullaney:
alexis@employmentlawnebraska.com

By: /s/ *Bonnie M. Boryca*
Bonnie M. Boryca #24886
Erickson & Sederstrom, P.C.
Counsel for Defendant-Appellee Westar Foods, Inc.

34